IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DARREN RAY PRATCHER,

      Petitioner,

  v.

RANDY GROUNDS, Warden,

      Respondent.

_____/

C 10-03616 CW (PR)

ORDER DENYING PETITION
FOR WRIT OF HABEAS
CORPUS; GRANTING, IN
PART, CERTIFICATE OF
APPEALABILITY

    Petitioner Darren Ray Pratcher, a California prisoner
proceeding pro se, filed a petition for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254, challenging the validity of his state
conviction and sentence.  Respondent filed an answer and a
memorandum of points and authorities in support thereof.[1]
Petitioner responded with a traverse.  Having considered all of the
papers filed by the parties, the Court DENIES the petition.

BACKGROUND

I.   Procedural History

    On October 11, 2006, after a thirty-five day trial, a Contra
Costa County Superior Court jury convicted Petitioner of one count
of first degree murder and found true the allegations of

---

    [1]In accordance with Habeas Rule 2(a) and Rule 25(d)(1) of the
Federal Rules of Civil Procedure, the Clerk of the Court is
directed to substitute Warden Randy Grounds as Respondent because
he is Petitioner's current custodian.

United States District Court

For the Northern District of California

intentional and personal use of a firearm.  Cal. Penal Code §§ 187, 12022.5(a)(1), 12022.53(b)-(d).  6 Court Transcript (CT) at 1609, 1772-73.

On January 19, 2007, the trial court sentenced Petitioner to twenty-five years to life in prison on the murder count and to an additional twenty-five years to life in prison on the Penal Code § 12022.53(d) firearm enhancement, for a total of fifty years to life in prison.

On July 30, 2009, the California Court of Appeal affirmed the trial court's judgment.  On August 26, 2009, the California Court of Appeal modified the opinion, without changing the judgment, and denied rehearing.

On September 3, 2009, Petitioner filed a petition for review in the California Supreme Court, which was denied summarily on November 10, 2009.  Resp.'s Ex. L.

On August 17, 2010, Petitioner filed the instant petition.

II.  Statement of Facts

The following is a summary of the key facts taken from the written opinion of the California Court of Appeal on direct review, People v. Pratcher, Case No. A117122, 2009 WL 2332183, (Cal. Ct. App. Jul 30, 2009) (unpublished).

On the evening of April 12, 2004, eighteen-year-old Terrance Kelly, nicknamed "T.K.," was shot and killed, while sitting in his car, by a bolt action (manual) .22 caliber rifle in Central Richmond, a neighborhood known as "Deep C."  Kelly suffered three gunshot wounds to the head and one to the back.  Kelly was not from Deep C but came there to pick up his friend, Brandon Young, who was visiting his girlfriend.  At some point before the shooting, Young

2

looked out the window and saw Petitioner wearing a white T-shirt and gray beanie walking past a group of townhouses known as the "Barretts." Petitioner was fifteen years old.

The prosecution presented the following evidence. About an hour prior to Kelly's murder, Petitioner went to the home of Vincent Owens and asked for the .22 caliber manual rifle which Owens was holding for a mutual acquaintance. Petitioner said he needed the gun "real quick" and gave Owens a toy BB gun in return for the rifle. Petitioner's left ring fingerprint would be found on the right side of the wooden stock on the rifle.

Earlier in the day, Charlia Potts saw Petitioner at the Barretts "horsing around" with some boys and girls. Potts did not see Petitioner with a BB gun, but saw Markel Robinson holding one. Potts saw and heard Petitioner argue with a girl and her cousin, Tamara Daniels. Later, a woman and a man came by in a car and Potts heard them arguing with Petitioner. That night, Potts saw Petitioner looking quiet and mad. Petitioner was holding something inside his coat; Potts was not sure if it looked like a gun, but acknowledged that she had told a police officer after the shooting that the object was a gun.

Jamelia Vaughn, who was nineteen years old at the time of trial, was married to Kevin Vaughn, who knew Petitioner and his brother, Larry Pratcher. On the evening of August 12, 2004, Jamelia and Kevin Vaughn picked up Petitioner, Larry Pratcher and Markel Robinson to give them a ride to Petitioner's house. When the three young men got into the car, either Petitioner or Larry was carrying "something long wrapped up," which she believed was a gun. Kevin asked Jamelia to drive them to a location to acquire

United States District Court
For the Northern District of California

1  another gun, but they were unsuccessful because they returned to

2  the car empty handed and discussed their inability to obtain

3  another gun.

4      A few days after Kelly was shot, Vanessa Hamilton, who was

5  sixteen years old at the time of the trial, was riding in a van to

6  go watch a "girl fight."  Petitioner was also in the van.  Hamilton

7  had heard Petitioner was involved in Kelly's shooting and she asked

8  him what happened.  Petitioner said, "I had to do what I had to

9  do."  He did not say anything else.

10     Richmond Police Detective Jeffrey Soler, an evidence

11 technician, was dispatched to the shooting scene.  He found three

12 .22 caliber casings near where Kelly's body had been.  Near one

13 casing, he found a gray wool cap and, on the sidewalk, he found a

14 sweatshirt/jacket.  On the side of a house nearby, behind a gate,

15 he found a rifle, a bag and a T-shirt.  In the chamber of the rifle

16 was an expended casing.

17     The autopsy revealed that Kelly had sustained three gunshot

18 wounds to the head and one to the back.  One bullet entered from

19 the top, right side of the head; another entered at the upper right

20 cheek; another entered at the lower right cheek; and the last

21 bullet entered the right back and punctured Kelly's heart and lung.

22 The cause of death was multiple gunshot wounds to the head and

23 torso.  The two facial wounds were not necessarily fatal.  The

24 gunshot wounds to the top of the head and back would have been

25 fatal within seconds.  The facial wounds were likely inflicted

26 first because Kelly would have been immediately incapacitated after

27 the shots to the top of the head and back.  It was possible that

28 the wound to the back resulted from Kelly being shot while he was

**United States District Court**
For the Northern District of California

slumped over the steering wheel of the car.

Criminalist Chris Coleman testified as an expert in firearms. He had examined the Marlin bolt action .22 caliber rifle found at the shooting scene.  The rifle was a manual weapon, meaning that once the gun was fired, the gun was decocked, and the shooter had to open the bolt, pull it back to eject the empty cartridge and cock the firing mechanism, push it forward and lock it to fire the next round.  Coleman could not determine whether the empty cartridge cases found at the scene were from the rifle also found there.  However, the empty cartridge cases and the cartridges found in the rifle all had the Remington head stamp on the rim of the cartridge and were all of the same caliber.  From the position of the cartridge cases found at the scene, Coleman opined that the shooter was moving as the shots were fired.

On August 14, 2004, Richmond Police executed a search warrant for Petitioner's house.  Petitioner was not present.  The police arrested Larry Pratcher, having received information that he was at the scene of the shooting.  Police made efforts to locate Petitioner, including issuing bulletins and placing his photograph in the newspaper, but could not find him.

On August 17, 2004, Petitioner came to the police station where he was interviewed about Kelly's murder.  The interview, which was videotaped, lasted approximately one hour.  Police officers placed Petitioner under arrest for Kelly's murder and transported him to the Martinez Juvenile Hall.  During the ride, Petitioner and the officers exchanged further dialogue and Petitioner gave another statement, which was recorded.  Although Petitioner did not confess during these interviews, he moved to

United States District Court
For the Northern District of California

1    suppress them.   The motion was denied.

2        Petitioner's defense was imperfect self-defense based on the

3    fact that he thought Kelly was Marlin Daniels, who he feared was

4    going to kill him.   The defense presented evidence that, earlier in

5    the evening of August 12, 2004, a man and his daughter came to

6    Petitioner's home.   The man told Petitioner's mother that he was

7    looking for Petitioner because he had shot his daughter with a BB

8    gun.   When Petitioner arrived home about twenty minutes later and

9    learned of the visit from a girl and her father, Petitioner looked

10   shocked and fidgeted with his hands.

11        Earlier that evening, Jamelia and Kevin Vaughn picked up

12   Petitioner, his brother Larry and Robinson at Owen's house to give

13   them a ride to Petitioner's home.   Jamelia Vaughn heard Petitioner

14   and his friends talk about something that had happened earlier in

15   the day when Marlin Daniels made threats against Petitioner's life.

16   Jamelia Vaughn heard them talk about the fact that Daniels had a

17   gun and was supposed to come back to kill Petitioner.   Petitioner

18   seemed upset and nervous.

19        Dr. Myla Young, a clinical neurologist, testified as an expert

20   in the field of psychology, with a specialization in the

21   neuropsychology of the adolescent brain.   Dr. Young had tested

22   Petitioner and found that his I.Q. was 83, which placed him in the

23   low average range.   He was in the eleventh grade, but his reading

24   and math skills were at a seventh or eighth grade level.

25   Petitioner's school records indicated that he did very well in

26   school in grades three to six, but in seventh through ninth grades,

27   he started to fail and did poorly on standardized testing.   Dr.

28   Young believed that the frontal area of Petitioner's brain was not

maturing normally, so that by the seventh or eighth grade, he did not have the brain maturity to keep up with his peers. At Juvenile Hall, his grades improved because he was in a structured environment.

Dr. Howard Friedman, a neuropsychologist, testified as an expert in the fields of psychology, neuropsychology, neuropharmacology and emotional disorders. Dr. Friedman met with Petitioner three times to evaluate whether emotional difficulties might have affected Petitioner's behavior during the charged offense. Dr. Friedman described post-traumatic stress disorder (PTSD) as an anxiety-related problem in which someone is involved in a traumatic or life-threatening experience and continues to re-experience the trauma thereafter. A person might have various symptoms, including nightmares about the experience, constant thinking about it or trying to avoid thinking about it. He testified that, according to research studies, up to seventy percent of children living in very violent communities suffer from elements of PTSD.

Petitioner told Dr. Friedman about many times he had been involved in violent incidents. Petitioner said he had recurring thoughts and dreams about the incidents and had images of bullets flying past his head. He also had nervous system reactions, such as a racing heart, sweating and changes in his breathing rate. Petitioner described symptoms of hypervigilence, of being on edge and looking for a threat all the time.

Petitioner told Dr. Friedman that his friends warned him that the father of the girl he had shot with a BB gun was dangerous and had killed people. Petitioner became scared and felt the man was a

**United States District Court**
For the Northern District of California

threat to him, was looking for him and potentially could kill him. Petitioner's friends encouraged him to get a gun to protect himself.  Petitioner told Dr. Friedman he had taken one tablet of Ecstasy and smoked marijuana within one hour of the shooting.  This combination of drugs would make a person feel more agitated and anxious.

Petitioner told Dr. Friedman that, when he arrived at the location where the shooting occurred, he was afraid he was going to be killed, he had the sensation of bullets flying past his head and heard the sounds of gunshots and car tires screeching, which related to actual violent episodes in which he had been involved. Dr. Friedman believed Petitioner's description was consistent with the symptoms of PTSD such as re-experiencing previous traumas and perceptual distortions.

Petitioner told Dr. Friedman that, when Kelly's car pulled up, Petitioner said he was thinking, "Him or me.  It's him or me. Gotta get him before he gets me."  Petitioner said he heard his friends say, "It's him.  It's him."  Petitioner believed he was going to be killed.  He went to the side of the building to get his gun, unwrapped it and went toward the car.  He was unable to see into the car, but shot into it.

According to Dr. Friedman, Petitioner's information and symptoms were consistent with PTSD.  See Pratcher, 2009 WL 2332183, at *1-15.

LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

8

28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" Supreme Court authority if it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  <u>Id.</u> at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case."  <u>Id.</u> at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  <u>Id.</u> at 411.  Federal habeas relief is available only if the state court's application of federal law is "so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.'"  <u>Nevada v. Jackson</u>, 133 S. Ct. 1990, 1992 (2013) (citing <u>Harrington v. Richter</u>, 131 S. Ct.

United States District Court<br>For the Northern District of California

770, 786 (2011)).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.  When the Supreme Court has not established clearly a rule on which the petitioner relies, "it cannot be said that the state court 'unreasonably appli[ed] . . . clearly established Federal law.'"  Carey v. Musladin, 549 U.S. 70, 71 (2006); see also Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2008) (federal habeas court must defer to the state court's decision when no Supreme Court decision squarely addresses the issue in the case or establishes a legal principle that clearly extends to a new context).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary."  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

If constitutional error is found, habeas relief is warranted only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d).  Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).  In the present case, the

California Supreme Court summarily denied Petitioner's petition for review. The California Court of Appeal, in its opinion on direct review, addressed all the claims Petitioner raises in his federal petition. Thus, the Court of Appeal is the highest court to have reviewed these claims in a reasoned decision, and it is that decision that this Court reviews herein.

DISCUSSION

In lieu of describing his claims on the printed habeas form itself, Petitioner submits his petition to the California Supreme Court.[2] Petitioner asserts the following seven claims here that he presented to the California Supreme Court: (1) a due process violation based on the direct filing of charges in adult criminal court as provided in California Welfare and Institutions Code section 707(d);[3] (2) a <u>Miranda</u> violation based on the admission of his pretrial statements to police officers; (3) a due process violation based on the exclusion of evidence of the criminal record of intended victim Marlin Daniels; (4) jury instruction errors; (5) prosecutorial misconduct; (6) juror misconduct; and (7) an Eighth Amendment violation for cruel and unusual punishment based on his sentence of fifty years to life in prison. The Court addresses each claim.

I.   Due Process Claim based on California Welfare and Institutions

_____

[2]When referring to Petitioner's federal petition, the Court will cite the page numbers that appear on the attached petition to the California Supreme Court and will refer to that petition as "the petition."

[3]In his petition to the Court of Appeal, Petitioner also asserted a claim that application of California Welfare and Institutions Code section 707(d) also violated his equal protection rights. However, he does not assert the equal protection claim in his federal petition.

11

Code Section 707(d)

A. Court of Appeal Decision

    1. Trial Background

The Court of Appeal found as follows.

Appellant was 15 years old when he shot and killed Terrance Kelly.  The prosecutor filed charges against him in criminal court under Welfare and Institutions Code section 707, subdivision (d)(2) (section 707(d)), which permits direct filing in criminal court for specified offenses without a prior juvenile court determination that the minor is unfit for disposition under juvenile court law.  FN11

FN11 Section 707(d)(2) provides in relevant part: "Except as provided in subdivision (b) of section 602, the district attorney or other appropriate prosecuting officer may file an accusatory pleading against a minor 14 years of age or older in a court of criminal jurisdiction in any case in which any one or more of the following circumstances apply:

"(A) The minor is alleged to have committed an offense that if committed by an adult would be punishable by death or imprisonment in the state prison for life.

"(B) The minor is alleged to have personally used a firearm during the commission or attempted commission of a felony, as described in Section 12022.5 or 12022.53 of the Penal Code."

Before trial, appellant filed a motion to dismiss the indictment and transfer his case to juvenile court, arguing that the direct file provisions of section 707(d) violated his rights to due process, equal protection, uniform operation of the laws, and the separation of powers provisions of the state and federal Constitutions.  The prosecutor opposed the motion, arguing that the court was bound by the California Supreme Court's decision in Manduley v. Superior Court (2002) 27 Cal. 4th 537, which had rejected several challenges to the constitutionality of section 707(d).  The trial court subsequently held a hearing on appellant's motion and ultimately denied it.

With respect to appellant's claim that the direct filing provisions violated his due process rights, the court ruled: "As to the first issue, which is the challenge to . . . Proposition 21, direct filings procedures based on the effect of Roper v. Simmons (2005) 543 U.S. 551 on Manduley, I am bound to follow Manduley, except to the extent that . . . the U.S. Supreme Court [Roper] decision casts substantial doubt on it. . . .

"[Roper] addressed an Eighth Amendment issue and, ultimately, punishment of death, and held that the death penalty wasn't appropriate for minors based on the less mature brain development and the effects that has on the ability to judge consequences and impulse control. . . .

"I don't think there's a due process problem here, and Manduley has dealt with most of the issues.

"There's the only issue open to me, which is whether [Roper] changes and substantially casts doubt on the validity of Manduley. I don't think it did, so that issue, I'm going [to] deny the motion."

The court later added:

"And I also note that [Roper] itself was a case in which the defendant was being prosecuted as an adult, so . . . the U.S. Supreme Court doesn't inherently have a problem with juveniles being prosecuted as adults because that's what happened in the [Roper] case.

"The question simply is who gets [to] make the decision. Manduley-since it's not unconstitutional for that decision to be made by the prosecution rather than by a Court, and I don't think that anything [in] Roper says that is an unconstitutional due process violation."

    2. Court of Appeal's Analysis

The Court of Appeal concluded as follows.

In rejecting the petitioners' due process claim, the California Supreme Court in Manduley stated: "[P]etitioners do not possess any right to be subject to the jurisdiction of the juvenile court.  As we have concluded, the legislative branch properly can delegate to the prosecutor-who traditionally has been entrusted with the charging decision-discretion whether to file charges against a minor directly in criminal court, and the Legislature also can eliminate a minor's statutory right to a judicial fitness hearing.  Therefore, a prosecutor's decision pursuant to section 707(d) to file charges in criminal court does not implicate any protected interest of petitioners that gives rise to the requirements of procedural due process." (Manduley, 27 Cal. 4th at 567)

Appellant acknowledges this holding in Manduley, but argues that it should be reconsidered in light of the subsequent United States Supreme Court cases of Atkins v. Virginia (2002) 536 U.S. 304, which held that execution of mentally retarded persons violated the Eighth Amendment, and Roper, 543 U.S. 551, which reached the same result with respect to offenders who committed their crimes when they were under the age of 18.

13

United States District Court
For the Northern District of California

However, both cases cited by appellant involved the death penalty, and the United States Supreme Court has repeatedly "held that 'death is different,' and [has] imposed protections that the Constitution nowhere else provides. [Citations.]" (<u>Harmelin v. Michigan</u> (1991) 501 U.S. 957.)  We are not persuaded that the decisions in <u>Atkins v. Virginia</u> and <u>Roper</u> affect the validity of our Supreme Court's holding in <u>Manduley</u>.

. . .

In sum, we are bound by our Supreme Court's decision in <u>Manduley</u>, 27 Cal. 4th 537.  Consequently, appellant's due process challenge to section 707(d) cannot succeed.

<u>Pratcher</u>, 2009 WL 2332183, at *16-17 (footnote omitted).

B.   Analysis

Petitioner argues that, pursuant to United States Supreme Court decisions in <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), and <u>Roper v. Simmons</u>, 543 U.S. 551 (2005), section 707(d) of the California Welfare and Institutions Code, which allows the prosecuting officer to charge a minor who is at least fourteen years of age in an adult criminal court if he is charged with certain offenses, is unconstitutional.  Petitioner's argument, which requires the reversal of <u>Manduley v. Superior Court</u>, 27 Cal. 4th 537 (2002), where the California Supreme Court held that section 707(d) does not violate a minor's rights to due process under the United States Constitution, is untenable.

<u>Atkins</u>, 536 U.S. at 321, held that the execution of mentally retarded persons violates the Eighth Amendment's prohibition against cruel and unusual punishment; <u>Roper</u>, 543 U.S. at 578-79, held that capital punishment of juveniles violates the Eighth and Fourteenth Amendments, because it contravenes the "evolving standards of decency that mark the progress of a maturing society." In an attempt to place section 707(d) under the Supreme Court's

14

United States District Court
For the Northern District of California

1   jurisprudence, Petitioner seizes hold of the Supreme Court's
2   description of minors as "less mature and responsible than adults,"
3   and that, particularly "during the formative years of childhood and
4   adolescence, minors often lack the experience, perspective and
5   judgment expected of adults." Petition at 7. However, as
6   correctly pointed out by the Court of Appeal, Atkins and Roper
7   involved the death penalty, and the Supreme Court repeatedly has
8   held that "death is different," extending special Constitutional
9   protections to death penalty cases. See Harmelin v. Michigan, 501
10  U.S. 957, 995-96 (1991). Neither Atkins nor Roper addressed the
11  issue that is addressed here and in Manduley, whether a state
12  prosecutor may constitutionally determine that a minor may be
13  prosecuted in adult court.

14      Furthermore, the facts of Roper do not support Petitioner's
15  argument. The defendant in Roper was seventeen years old at the
16  time he committed the charged offenses at issue and was tried in
17  adult court. Roper, 543 U.S. at 557. Although the Supreme Court
18  did not directly address the issue of the juvenile defendant's
19  trial as an adult, it affirmed his sentence of life without the
20  possibility of parole. Id. at 560, 578-79. These facts undermine
21  Petitioner's position that Manduley must be reconsidered in light
22  of the holding in Roper. Furthermore, because Atkins and Roper did
23  not address the same issues as Manduley, Petitioner has failed to
24  demonstrate that there was a basis for the state court to
25  reconsider it. Finally, Petitioner has failed to cite established
26  Supreme Court precedent on this issue. Accordingly, the Court of
27  Appeal's rejection of Petitioner's claim was not contrary to or an
28  unreasonable application of Supreme Court precedent. See Carey,

15

**United States District Court**
For the Northern District of California

1    549 U.S. at 71.  Petitioner is not entitled to habeas relief on

2    this claim.

3    II.   <u>Miranda</u> Claim

4          A. Court of Appeal Decision

5                1. Trial Court Background

6          The Court of Appeal found as follows.

7          Before trial, appellant moved to exclude his statements to the
     police as involuntary and taken without a knowing and
8          intelligent waiver of his <u>Miranda</u> rights.

9          At a hearing on the motion to suppress, the prosecutor
     presented the testimony of Sergeant Mitchell Peixoto, who
10   interviewed appellant at the Richmond Police Department and
     then transported him to Martinez Juvenile Hall on August 17,
11   2004, five days after the shooting.  Before the interview,
     Peixoto advised appellant of his <u>Miranda</u> rights.  When Peixoto
12   asked appellant if he understood those rights, appellant said
     "yes" or "yeah."  Near the end of the interview, appellant
13   told Detective Villalobos, who was present at the time, that
     he wanted a lawyer.  The officers ended the interview and
14   prepared appellant for transportation to Juvenile Hall.

15         . . .

16         On cross-examination, Peixoto testified that he had received a
     call at about 6:30 p.m. on August 17 that appellant had turned
17   himself in.  Peixoto arrived at the Richmond Police Department
     at about 7:30 p.m. and he and Detective Villalobos began the
18   interview with appellant at 8:30 p.m.  Appellant was alone in
     an interview room when Peixoto arrived.  During the videotaped
19   interview, the officers talked to appellant about the beanie
     cap found at the scene and appellant said he had lost a
20   beanie.  The officers told appellant that they would be able
     to determine whether there were any of his hairs on the
21   beanie.  Peixoto also falsely said there are scientific
     techniques that can determine within a matter of hours when a
22   hair came out of someone's head and ended up on the cap; he
     said this in the hope that appellant would say something
23   incriminating.

24         At one point during the interview, after Peixoto asked when he
     lost his beanie, appellant asked to use the phone, but Peixoto
25   said he did not have a phone with him.  Peixoto also said they
     would get to that (i.e., the question of when he lost his
26   beanie), but right then it was not important.  In the middle
     of the interview, appellant said something about his father
27   having mentioned an attorney and he was starting to think
     about that.  He also asked questions about whether he could
28   get a lawyer, and Peixoto answered in the affirmative, saying
     he had read appellant his rights.  He also asked if appellant

had understood them.  Peixoto then continued questioning appellant because appellant had not asked for an attorney. Peixoto left the room and a short time later Villalobos ended the interview.

While Peixoto and Villalobos were transporting appellant to Juvenile Hall, appellant seemed nervous, and he asked where he was being taken.  Peixoto responded that appellant had been arrested for murder and was being booked at Juvenile Hall. When appellant asked why he was being booked for murder, Peixoto said that he believed appellant was being untruthful and that "'[w]e have witnesses put you at the scene.'" Appellant started talking about other people telling him to be untruthful and Peixoto told him to stop talking.  Most of the conversation during the drive to Martinez involved Peixoto telling appellant not to talk because he had already asked for an attorney and the officers were in no position to take another statement at that time.

During the second interview in the back of the patrol car, which began at 10:38 p.m. and was recorded with an audio recorder set up on the center console, Peixoto did not re-advise appellant of his <u>Miranda</u> rights, nor did he offer to let appellant make a phone call or tell him that he could have a family member present.  Peixoto told appellant he could ask for an attorney at any time during the statement.  The officers prepared a written statement at the end of the interview and appellant signed it.

Appellant's father, Larry Pratcher, Sr., also testified at the hearing on the motion to suppress.  On August 17, 2004, Mr. Pratcher talked to appellant on the telephone and appellant said he wanted to turn himself in. . . .

While driving to the police station and also while waiting in the small room, Mr. Pratcher told appellant not to speak to the police.  On the drive to the station, he also told appellant not to speak to police without an attorney present. The two officers who came into the room said they were taking appellant to an interview room for further questioning and, before they left, Mr. Pratcher believed he told appellant not to speak to them without an attorney present, but he was not sure.  At that point, Mr. Pratcher and the pastor left the station.  No officer asked Mr. Pratcher whether he wanted to be present while appellant was being questioned.

On cross-examination, Mr. Pratcher testified that he was aware that appellant was arrested on a gun charge a couple of months before August 17, 2004.  He believed appellant understood him when he said not to talk to police without an attorney present.  Appellant responded, "Okay."

After argument by counsel, the trial court issued its ruling. First, with respect to the <u>Miranda</u> issue, the court stated that, in the videotape, "initially, [appellant] is in the

17

**United States District Court**
For the Northern District of California

interview room by himself.  And there is, in my opinion, no evidence of stress, of discomfort, of nervousness.  He is just sitting in the chair.  There's no fidgeting, there's no outward sign of emotional effect.  He doesn't look like he's upset about being in the police department, at least from his demeanor.  He's not pacing the room, he's sitting in the chair. [¶] We often get a lot of information watching someone in the interview room before or during the interview when they're left alone.  And none of the things that I often see were present here."

The court further stated that there was "nothing in the conversation either at the time or later that leads me to believe that [appellant] did not understand the [<u>Miranda</u>] warning."  The court also said that, in light of appellant's previous arrest and acknowledgment that he had been in jail before, it was reasonable to assume that appellant had previous experience with talking to officers and receiving <u>Miranda</u> warnings, and that he came across on the videotape as "fairly street smart."  The court noted that appellant had done well in school until recently and there was no evidence of handicaps regarding comprehension, and also said, "I have to note that a 15-year-old today in an urban environment is what a 20-year-old used to be."  Appellant did not seem to be at a loss in talking with the officers; nor did he seem "intimidated by them at all."  In concluding there was no <u>Miranda</u> violation, the court further observed that appellant's father thought appellant understood him when he said not to talk to the police officers.

With respect to voluntariness, the court again noted that there was no evidence of nervousness, distress, or emotional upset either before or during the videotaped interview.  Appellant did not ask to speak with his father or another adult.  The officers were not overbearing, aggressive, or intimidating, but rather were conversational in tone.  The court further observed that appellant withstood any subtle pressure to say something incriminating, never wavering from his insistence that he was not present at the scene.

The court then discussed Peixoto's mention of appellant's brother, when he had said that appellant's brother was in jail and was to be arraigned in the morning: "'I mean we need to get to the bottom of this, you know.  Maybe he don't need to be there, you know.'"  The court found this statement "troubling" and "borderline."  However, in the context of the entire interview, the court did not believe it invalidated the voluntariness of appellant's statement, particularly since appellant did not cave in to the pressure and make an incriminating statement.

Regarding the "ruse of telling [appellant] that the DNA from the cap can time the placement of the cap at the scene," the court noted that such a ruse is not prohibited, but instead is another factor to be considered in the totality.  Appellant's

voice reflected more concern at that point, but he still
denied being present at the scene, only acknowledging that he
had a cap and lost it.  The court believed appellant may have
realized he was in trouble at that point because he then
clearly invoked his right to an attorney, which led the police
officers to immediately stop the interview.

Regarding appellant's father's statement to appellant that he
should not talk to police without an attorney present, the
court again noted that it is a factor to take into account.
But, in this case, the court found that Mr. Pratcher's
statements and his testimony that appellant seemed to
understand him demonstrate that appellant understood his right
not to talk to police without an attorney present and chose to
ignore it.

The court then concluded that appellant's first statement,
made at the police department, was voluntary.  The court also
reiterated its conclusion that the <u>Miranda</u> warning was
properly given and that the waiver was knowing and
intelligent.

As to the second interview, the court found that appellant
clearly initiated the interview.  It also believed that the
officers acted properly in reminding appellant of his
invocation of his right not to talk without an attorney
present.  The court further found that there was no legal
requirement for a re-admonishment at the start of the second
interview, given that there was only a short time-a bit more
than an hour-between the end of the first statement and the
beginning of the second.

Although appellant sounded concerned during the second
interview, the court found that he initiated the interview
repeatedly and there was no evidence of coercion during that
interview.  Appellant clearly wanted to change his original
statement, asking if he could "tell them the additional piece
and then invoke and get a lawyer and not talk to them any
further."  The officers repeatedly told appellant he could
invoke and get a lawyer at any time.  Finally, the court noted
that everything appellant said in both interviews was
exculpatory, and there was no evidence of any coercion or that
his will was overborne.  Indeed, the evidence showed appellant
understood he had a right to an attorney and invoked when "it
was getting a little hot" during the first interview.  The
court thus concluded that both statements were voluntary and
admissible.

<u>Pratcher</u>, 2009 WL 2332183, at *20-23 (footnote omitted).

        2. Court of Appeal's Analysis

     The following are the relevant portions of the Court of
Appeal's analysis.

a. Alleged <u>Miranda</u> Violation

Appellant [] argues that the coercive circumstances of his custody and interrogation require a finding that he did not validly waive his <u>Miranda</u> rights and that his statements to police were not freely and voluntarily made.  According to appellant, during the first interview, the officers' refusal to let appellant make a telephone call constituted a violation of section 627, subdivision (b), . . .

. . .

With respect to the officers' refusal of appellant's request to make a telephone [sic] during the first interview, the trial court did not believe appellant was attempting to exercise his right to call an attorney.  Instead, the court believed that, in context, "when he's asking about the phone, isn't the immediate conversation before that about trying to remember when he lost the beanie and then he says he doesn't remember.  And the officer says, 'Think about it.' And [appellant] says, 'Could I use your phone?'  Isn't the context this has to do with finding out when he lost his beanie[,] from the transcript?"

The trial court's finding that appellant was not attempting to invoke his right to call a parent or counsel when he asked to make a phone call is supported by substantial evidence.  FN17 (<u>See</u> <u>People v. Williams</u> (1998) 16 Cal. 4th 635, 659-660.)

FN17 After the exchange between appellant and the officer mentioned by the trial court, the officer said, "And if that's something I think we need to go back to, we'll get you the phone and we'll . . . -know exactly what it is."

b. Voluntariness

With respect to the first interview, appellant argues that Peixoto's false statement that DNA analysis could show, within a few hours, when a hair or hair follicle had been deposited in a beanie demonstrates coercion.  He also asserts that the officers falsely told him that if he gave them names of other people who had been at the crime scene, they would not keep a record of what he told them, so he would not be a snitch.  Appellant further argues that Peixoto's reminder that appellant's brother, Larry, was in custody and his suggestion that "maybe your brother doesn't need to be in there" was another coercive tactic that rendered his statement to police involuntary. . . .

. . .

In the present case, as in <u>Shawn D.</u>, the officers' lies to appellant and the comment about his brother are factors to consider in determining whether coercive tactics by the police rendered appellant's statement involuntary.  Here, however,

the potentially coercive incidents did not permeate the
interview; nor did appellant receive any promises of leniency.
(Compare Shawn D., 20 Cal. App. 4th at 214.)  Moreover, as the
trial court pointed out, none of these tactics worked:
appellant never confessed to shooting Kelly and, when he
perhaps became more concerned after the officers discussed his
lost beanie with him, appellant ended the interview.  As our
Supreme Court concluded in People v. Williams, 16 Cal. 4th
635, 660: "[T]he record [belied] defendant's claims that his
admissions were the product of police coercion" where the
defendant maintained his innocence during most of the
interrogation and, even when he later admitted his presence at
the scene of the murders, he insisted that he had played no
role in the killings.

There are additional factors to consider in assessing the
voluntariness of appellant's statement during the first
interview.  (See People v. Massie, 19 Cal. 4th at 576.)  On
the one hand, appellant was only 15 years old, was described
as being immature with a low average IQ, and was possibly
suffering from PTSD.  On the other hand, appellant had done
quite well in school until his grades started slipping in
middle school; he had suffered a recent arrest and was
presumably familiar with police questioning and Miranda
warnings; his father had told him not to talk to police
without an attorney present, and believed appellant understood
what he had told him, and appellant chose to ignore this
advice until quite late in the interview; he was given Miranda
warnings at the start of the interview and said he understood
them; the interview was not prolonged; the officers were not
aggressive or intimidating in their questioning; appellant did
not seem nervous or upset and denied his involvement
continuously; and the officers stopped the interview as soon
as appellant invoked his right to an attorney.

Balancing the various factors for and against voluntariness,
we conclude that, in the totality of the circumstances,
appellant's statement during the first interview was
voluntary. (See People v. Massie, 19 Cal. 4th at 576.)
With respect to the second interview, appellant claims his
statement should have been suppressed because it was the
product of the first, tainted, interrogation.  This argument
fails, given our finding that appellant's statement from the
first interview was properly admitted.  Appellant also argues,
however, that the statement should have been suppressed
because the prosecution did not prove that appellant
voluntarily reinitiated questioning after invocation of his
Fifth Amendment privilege.  According to appellant, Peixoto's
comment, while driving appellant to Juvenile Hall, that he did
not think appellant was being truthful and that he believed
appellant had been at the scene were calculated to elicit a
response from appellant and therefore constituted further
police-initiated interrogation.  We disagree.

First, Peixoto's comment that he believed appellant was being untruthful and that there were witnesses who put appellant at the scene was in direct response to appellant asking why he was being booked for murder. Most of the remainder of the conversation during the drive to Martinez consisted of Peixoto telling appellant not to talk because he had already asked for an attorney. Later, when the officers took an additional statement from appellant, they repeatedly reminded him of his right to have an attorney present while he gave a statement. We thus agree with the trial court's findings that appellant clearly initiated the second interview and that the officers acted properly in reminding appellant of his invocation of his right to counsel. As the United States Supreme Court explained in <u>Edwards v. Arizona</u> (1981) 451 U.S. 477, 484-485, an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*" (Italics added).

For all of these reasons, both of appellant's statements to police were properly admitted at trial.

<u>Pratcher</u>, 2009 WL 2332183, at *24-28 (footnotes omitted).

B.   Federal Authority

In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statement made during a custodial interrogation can be admitted in evidence.  The requirements of <u>Miranda</u> are "clearly established" federal law for purposes of federal habeas corpus review under § 2254(d).  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1271 (9th Cir. 2005).

<u>Miranda</u> requires that a person subjected to custodial interrogation be advised that he has the right to remain silent, that statements made can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed. These warnings must precede any custodial interrogation, which occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly depriving a person of freedom of action.  <u>Miranda</u>, 384 U.S. at 444.

22

Once properly advised of his rights, an accused may waive them voluntarily, knowingly and intelligently. Id. at 475. The distinction between a claim that a Miranda waiver was not voluntary, and a claim that such waiver was not knowing and intelligent is important. Cox v. Del Papa, 542 F.3d 669, 675 (9th Cir. 2008). The voluntariness component turns on the absence of police overreaching, i.e., external factors, whereas the cognitive component depends upon the defendant's mental capacity. Id. A valid waiver of Miranda rights depends upon the totality of the circumstances, including the background, experience and conduct of the defendant. United States v. Bernard S., 795 F.2d 749, 751 (9th Cir. 1986). In the case of juveniles, this includes evaluation of the juvenile's age, experience, education, background and intelligence, and whether the juvenile has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights and the consequences of waiving those rights. Juan H., 408 F.3d at 1271 (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)).

The government must prove waiver by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168-69 (1986). The waiver need not be express as long as the totality of the circumstances indicates that the waiver was knowing and voluntary. North Carolina v. Butler, 441 U.S. 369, 373 (1979); Juan H., 408 F.3d at 1271.

"Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Berghuis v. Thompkins, 130 S. Ct. 2250, 2261-62 (2010).

United States District Court
For the Northern District of California

The law presumes that individuals who fully understand their rights and act in a manner inconsistent with them have made "a deliberate choice to relinquish the protection those rights afford." Id. at 2262 (citations omitted).  Although the burden is on the government to prove voluntariness, a waiver cannot be held involuntary absent official compulsion or coercion.  Connelly, 479 U.S. at 170; United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988).

A suspect who has expressed a desire to have counsel present during custodial interrogation is not subject to further interrogation by the authorities until counsel is made available to him, unless the suspect himself initiates further communication with the police.  Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); Taylor v. Maddox, 366 F.3d 992, 1014-15 (9th Cir. 2004).

If a Miranda violation is established, habeas relief should be granted only if the admission of statements "'had a substantial and injurious effect or influence in determining the jury's verdict.'" Calderon v. Coleman, 525 U.S. 141, 147 (1998).

   C. Analysis

      1. Knowing and Intelligent

The California Court of Appeal correctly identified Miranda and its progeny as the controlling law, and properly applied it in affirming the trial court's conclusion that Petitioner's pretrial statements were not taken in violation of his Miranda rights.  The state appellate court reasonably found that the totality of the circumstances indicated that Petitioner knowingly waived his Miranda rights with respect to his first statement in the police station and his second statement in the police car on the way to Juvenile Hall.

United States District Court
For the Northern District of California

Before Petitioner began talking to Sergeant Peixoto and Detective Villalobos at the police station, Sergeant Peixoto advised Petitioner of his <u>Miranda</u> rights. <u>See</u> Resp.'s Ex. B, Supplemental Clerk's Transcript (Supp. CT), Transcript of Videotaped Interview, at 3. Immediately after he gave the <u>Miranda</u> warnings, Detective Peixoto asked Petitioner if he understood them and Petitioner responded, "Yeah," and then proceeded to answer the officers' questions. Supp. CT at 4. As the state court reasonably found, by stating that he understood his rights and then proceeding to talk to the police officers, Petitioner impliedly waived his rights. <u>See</u> <u>Berghuis</u>, 130 S. Ct. at 2261-62; <u>Butler</u>, 441 U.S. at 373. This conclusion is supported by Petitioner's statement later in the interview, "I was told . . . I wouldn't talk to you guys without an attorney, something like that. But I say—I'm just telling what happened." Supp. CT at 11. Finally, when Petitioner became uncomfortable with the officers' questions about finding a beanie at the scene of the shooting, he said, "I think I need an attorney right now." Supp. CT at 15. Detective Villalobos said, "Okay," and ended the interview. <u>Id.</u> The fact that Petitioner knew he could have an attorney, and was able to invoke that right when he became aware that evidence might place him at the scene of the shooting, shows that he understood his <u>Miranda</u> rights and knowingly waived them.

The transcript of the second statement in the police car shows that Petitioner initiated this conversation with the officers. At the beginning of Petitioner's second statement, the following colloquy took place between Petitioner and the officers:

Petitioner:    Well, I'm talking about, I'm talking about

|       |             |                                                                                  |
|-------|-------------|----------------------------------------------------------------------------------|
|       |             | (unintelligible) tell you the truth.                                            |
| Det:  |             | You can do that right now, as long as you don't care that you don't have an attorney. |
| Petitioner: |       | Yeah.                                                                            |
| Det:  |             | Okay.  Let's do it now.                                                          |
|       |             | . . .                                                                            |
| Det:  |             | So, Darren, basically what are you telling me, Darren?                           |
| Petitioner: |       | I'm telling you that I was, I was there.                                         |
| Det:  |             | I mean about the, about the attorney.                                            |
| Petitioner: |       | I want an attorney present after (unintelligible).                              |
| Det:  |             | So, you want, you want to change your original statement without an attorney being here. |
| Petitioner: |       | Yeah.                                                                            |
| Det:  |             | Having the right to again ask for an attorney later?                            |
| Petitioner: |       | Yeah.                                                                            |
| Det:  |             | Is that right?                                                                   |
| Petitioner: |       | Yeah.                                                                            |

Supp. CT at 17.

Petitioner then proceeded to tell the officers that his first statement, that he was not at the scene of the shooting, was not true, and that he had been untruthful on the advice of others. Petitioner then told the officers that he was present when the shooting took place, but that he was behind a building and could not identify the shooter.

The state court reasonably found that Petitioner knowingly waived his <u>Miranda</u> rights when he initiated the conversation and continued it even after police officers advised him of his right to

26

United States District Court
For the Northern District of California

an attorney.  <u>See</u> <u>Edwards</u>, 451 U.S. at 484-85 (if suspect re-initiates further communication with police after invoking his right to counsel, police may continue the interview).  The state court also reasonably found that Petitioner's actions show that he knowingly and intelligently waived his <u>Miranda</u> rights.  <u>See</u> <u>Berghuis</u>, 130 S. Ct. at 2260-61 (showing that suspect understood his rights and then spoke with police indicates implicit waiver of <u>Miranda</u> rights).

The state court also considered that Petitioner was only fifteen years old at the time of the police interviews and may have been suffering from PTSD.  The court found that these factors were outweighed by the facts that Petitioner had prior, recent experience with police interviews, he had done well in school until he reached middle school, he had done well in classes in juvenile hall and his father testified that he thought Petitioner understood his advice to talk to police only with an attorney present.  Based upon this analysis, the state court reasonably found that Petitioner had the capacity to understand the warning given to him, the nature of his rights and the consequences of waiving those rights.

2. Voluntariness

The test for voluntariness "is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." <u>Leon Guerrero</u>, 847 F.2d at 1366 (citing <u>Haynes v. Washington</u>, 373 U.S. 503, 513-14 (1963)).  The suspect's age may be taken into account in determining whether a confession was voluntary. <u>Doody v. Ryan</u>,

United States District Court
For the Northern District of California

1  649 F.3d 986, 1008 (9th Cir. 2011) (en banc).

2       With respect to the first interview, the only statements by

3  the officers that could be considered coercive were the false

4  statement about DNA evidence on the beanie and the statement

5  concerning Petitioner's brother.  However, such statements did not

6  permeate the interview and Petitioner received no promises of

7  leniency.  Moreover, the fact that Petitioner did not change his

8  story that he was not at the scene of the shooting is evidence that

9  these statements did not overbear his will.  This conclusion is

10  supported by the facts that the officers were not aggressive or

11  intimidating and that they stopped the interview as soon as

12  Petitioner invoked his right to an attorney.  Furthermore, the

13  Court of Appeal weighed many factors, such as Petitioner's age,

14  experience, education, intelligence, his father's warnings and the

15  fact that the interview was not prolonged, and reasonably concluded

16  that they supported a finding that Petitioner was not coerced into

17  making his statement.  Considering the totality of the

18  circumstances, the officers' two "questionable" statements did not

19  constitute the kind of psychological coercion or improper

20  inducement that would overbear Petitioner's will.  See Leon

21  Guerrero, 847 F.2d at 1366.  Accordingly, the Court of Appeal

22  reasonably concluded that Petitioner's first statement was

23  voluntary.  See Connelly, 479 U.S. at 170 (waiver cannot held to be

24  involuntary absent official compulsion or coercion).

25       With respect to the second interview, the evidence indicates

26  that Petitioner initiated the conversation even as officers

27  repeatedly reminded him of his right to counsel.  Under clearly

28  established Supreme Court precedent, if a suspect initiates further

communication with officers after he has invoked his right to an attorney, the officers may constitutionally continue the communication.  See Edwards, 451 U.S. at 484-85.  Petitioner argues that Detective Peixoto initiated the further communication by telling him that he was being arrested for murder because he believed Petitioner was being untruthful and that witnesses put him at the scene.  However, the Court of Appeal reasonably found that Detective Peixoto was responding to Petitioner's inquiry about where he was being taken and why he was being booked for murder. See Pratcher, 2009 WL 2332183 at *21, 28.  During the recorded second interview, the officers repeatedly reminded Petitioner that he had a right to have an attorney present.  Supp. CT at 17-23. Thus, the totality of the circumstances demonstrates that Petitioner's second statement was made voluntarily.

In his petition, Petitioner argues that the Court of Appeal's finding that his statements were voluntary because he did not incriminate himself was unreasonable.  Petitioner points out that his statements to the officers were incriminating because the prosecutor used them to impeach his statements to psychologists and argued that his false statements to police were evidence of his guilt.  However, the fact that Petitioner did not make incriminating statements in his interviews was only one of many factors considered by the Court of Appeal.  Furthermore, that Petitioner's statements to the police were later used by the prosecutor to incriminate him does not mean that, during the interview, Petitioner's will was overborne by the officers; the transcripts of the interviews show that Petitioner had a version of events that he wanted to relate to the officers and nothing the

1    officers said deterred him from providing that story.

2         Accordingly, the Court of Appeal's denial of the <u>Miranda</u> claim

3    was not contrary to or an unreasonable application of Supreme Court

4    authority.

5    III.   Exclusion of Evidence

6         A.   Background

7         The Court of Appeal summarized the facts pertaining to this

8    claim as follow:

9         Appellant contends exclusion of evidence of Marlin Daniels's
         criminal records violated appellant's constitutional right to
10        present a defense and to due process of law.  In particular,
         he argues that Daniels's records were admissible pursuant to
11        Evidence Code sections 1103 and 1202.

12        After the prosecutor concluded his rebuttal case, defense
         counsel sought to introduce some of Marlin Daniels's criminal
13        records, arguing that the evidence was relevant to show that
         appellant reasonably relied on information he heard about
14        Daniels's violence, to corroborate statements appellant made to
         Dr. Friedman about having heard that Daniels had killed people.
15        While counsel acknowledged that appellant's statements to Dr.
         Friedman were not admitted for the truth, he thought the
16        evidence should be admitted, given that the prosecutor had been
         permitted to impeach statements appellant made to Dr. Friedman.
17        In particular, counsel asked the court to admit records
         pertaining to Daniels's convictions for involuntary
18        manslaughter, drug use and sales, and burglary, as well as a
         record of a restraining order against Daniels.
19
20        The prosecutor objected to the admission of this evidence,
         arguing, "there's no legal basis for getting in a
21        non-testifying individual's prior record to show that a
         non-testifying defendant believed that he was a threat to him
22        in some fashion because that's what he told his psychologist
         when the statements don't come in for the truth of that."
23
24        The court denied appellant's request, explaining: "I will note,
         initially, that all the evidence that was allowed on
25        cross-examination to impeach the defendant was allowed to
         impeach his credibility and those were based on personal
26        knowledge of those events; specifically, the discipline issues
         at school were based on his personal knowledge of those events
27        since he was a participant in them.
28

                                      30

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

"And that's one example.  Each piece of evidence that was
allowed as impeachment of his credibility [was] strictly based
on his personal knowledge of those events.  [Appellant] has no
knowledge, whatsoever, of Mr. Daniels'[s] criminal history,
some of which occurred before he was born. . . .

"The information that would corroborate [appellant's]
statements to the psychologist could have been those
individuals who told [appellant] about Mr. Daniels'[s] criminal
history or penchant for violence or penchant for whatever.
Those were the individuals who allegedly told him that he
should be concerned, wary, apprehensive of, scared of this
individual for a variety of reasons.  That would be the
corroboration because the corroboration would necessarily have
to be of [appellant's] statements to the doctor that he was
scared of this individual because of what he was told.  There
is no evidence whatsoever that [appellant] knew, had ever met
or had ever seen Mr. Daniels. . . .

"The criminal history records, I don't think there's an issue
about the foundation admissibility.  It's the relevance and
whether or not they are proper corroboration.  He has no
knowledge of those.  It doesn't corroborate anything because he
had no knowledge of those.

. . .

"Similarly-or actually, a collateral issue, Mr. Daniels being a
dope fiend, in and of itself, is not relevant. . . . There is
nothing to say that somebody who is a quote dope fiend, dope
addict, acts in a particular manner. . . .

Pratcher, 2009 WL 2332183, at *28-30.

B. Analysis

On appeal, Petitioner argued that Daniels's criminal records
were admissible under California Evidence Code section 1103 as
evidence of Daniels's bad character for assaultiveness and deadly
violence and under Evidence Code section 1202 as evidence to
impeach Daniels's hearsay statements that he just wanted to talk to
appellant.  The Court of Appeal held that this claim was
procedurally defaulted because defense counsel did not argue for

United States District Court
For the Northern District of California

admission of this evidence in the trial court on the grounds raised on appeal. The court reviewed the record below and found that counsel argued primarily for admission of Daniels's record as corroboration of Petitioner's statements to Dr. Friedman that he feared Daniels and secondarily as corroboration of Ms. Pratcher's testimony that Daniels seemed to be under the influence when he came to her house and, thus, the trial court based its ruling solely on those grounds.

Here, Respondent correctly argues that Petitioner's failure to preserve this claim for appeal precludes him from raising it on federal habeas review.

A federal court will not review questions of federal law decided by a state court if the decision rests on a state law ground that is independent of the federal question and adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729-30 (1991). Claims not properly raised at trial are procedurally defaulted and may not be considered in a federal habeas corpus proceeding absent a showing of cause for the default and resulting prejudice. See Davis v. Woodford, 384 F.3d 628, 654 (9th Cir. 2004)(claim procedurally defaulted because constitutional issue was not raised at trial); see also Bonin v. Calderon, 59 F.3d 815, 842-43 (9th Cir. 1995) (claim procedurally defaulted because petitioner failed to raise properly objection during trial).

Here, not only did Petitioner not raise a constitutional issue based on exclusion of evidence in the trial court, he did not raise the evidentiary issue on the same grounds that he raised on appeal. Thus, this claim is procedurally defaulted.

A federal court will only review a claim disposed of by the state court on an independent and adequate state ground if the petitioner shows either "cause and prejudice" or "miscarriage of justice." <u>Wainwright v. Sykes</u>, 433 U.S. 72, 87 (1977); <u>McClesky v. Zant</u>, 499 U.S. 467, 493 (1991).

Under "cause and prejudice" analysis, the petitioner must show (1) cause: that some objective factor impeded efforts to raise the claim at the appropriate proceeding, and (2) prejudice: that, in the total context of the events at trial, the impediment worked to the petitioner's actual and substantial disadvantage, with errors of constitutional dimensions. <u>Id.</u> at 494.  If the petitioner does not meet the standard for "cause and prejudice," a federal court may still review the claim if a "miscarriage of justice" occurred. <u>Sawyer v. Whitley</u>, 505 U.S. 333, 339 (1992).  The "miscarriage of justice" exception only applies if the petitioner claims actual innocence. <u>Coleman</u>, 501 U.S. at 748; <u>McClesky</u>, 499 U.S. at 494.

In his federal petition, Petitioner does not acknowledge that the state court ruled that this claim was waived and, thus, does not show cause for his procedural default or argue that he is actually innocent.[4]  Thus, this Court is precluded from reviewing Petitioner's improper exclusion of evidence claim because he has not shown cause or a miscarriage of justice, to excuse his procedural default.

Even if this Court could review Petitioner's exclusion of evidence claim, it would fail on the merits, as discussed below.

---

[4]Petitioner argues he was prejudiced by the omission of this evidence.  However, without cause, prejudice alone is insufficient to overcome a procedural default bar.  Therefore, the Court does not address the prejudice argument.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

The trial court's evidentiary ruling may be addressed in a federal habeas action only if it violated federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991); <u>Walters v. Maass</u>, 45 F.3d 1355, 1357 (9th Cir. 1995). "State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." <u>Holmes v. South Carolina</u>, 547 U.S. 319, 324 (2006) (quotations and citations omitted); <u>see also Montana v. Egelhoff</u>, 518 U.S. 37, 42 (1996) (holding that due process does not guarantee a defendant the right to present all relevant evidence). This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments. <u>Holmes</u>, 547 U.S. at 324.

In a footnote, the California Court of Appeal addressed the merits of this claim. Citing <u>People v. Cash</u>, 28 Cal. 4th 703, 726 (2002), the court concluded that Daniels's criminal records reflecting violence were not corroborative of Petitioner's statements to Dr. Friedman that he was afraid of Daniels because Petitioner was not aware of those records. <u>Pratcher</u>, 2009 WL 2332183, at *30 n.22.

Petitioner argues that Court of Appeal wrongly applied <u>Cash</u>. In <u>Cash</u>, the court ruled that the victim's customary violent debt collection practices were not relevant to show the defendant's state of mind at the time he killed the victim because he did not know of those practices. 28 Cal. 4th at 726. Petitioner argues that <u>Cash</u> is inapplicable because the defendant in that case was

not seeking admission of prior bad acts as character evidence, but as evidence of the victim's conduct at the time of the crime, whereas Petitioner sought to have Daniels's records admitted as character evidence showing his propensity for violence.

However, as found by the Court of Appeal, Petitioner only argued to the trial court that he sought to have the evidence admitted to corroborate his statements to the psychologist that he was afraid of Daniels.  As reasonably found by the Court of Appeal, because Petitioner lacked knowledge of Daniels's criminal record, it could not have served to corroborate his statements to the psychologist.  Also, as found by the Court of Appeal, any record of Daniels's use of drugs was not relevant to whether Petitioner was afraid of Daniels.

Furthermore, the jury was aware of Petitioner's knowledge of Daniels's propensity for violence through the testimony of Ms. Vaughn and through the testimony of Petitioner's mother about Daniels' threatening demeanor when he came to her house, which was admitted to show Petitioner's state of mind in acting in unreasonable self-defense.  See Reporter's Transcript (RT) at 2587, 2607, 2613.  Thus, the evidence of Daniels's criminal record also was cumulative to other admitted evidence so that its exclusion did not violate Petitioner's federal right to present his defense.

In summary, this claim is denied because it is procedurally barred.  Furthermore, on the merits, the Court of Appeal's rejection of this claim was not unreasonable.  For both of these reasons, Petitioner is not entitled to habeas relief on this claim.

IV.   Jury Instructions

Petitioner contends that the trial court improperly (1) refused a defense request to instruct on the significance and effect of antecedent threats; (2) refused a defense request to instruct on heat of passion; and (3) refused a defense request to modify an instruction on imperfect self-defense.

A.   Court of Appeal Decision

The Court of Appeal concluded as follows.

1.   Antecedent Threats

Appellant requested that the jury be instructed on antecedent threats by Daniels, pursuant to CALJIC No. 5.50.1, which provides in relevant part: "Evidence has been presented that on [a] prior occasion[s] the alleged victim [threatened] . . . the defendant.  If you find that this evidence is true, you may consider that evidence on the issues of whether the defendant actually and reasonably believed [his] . . . life or physical safety was endangered at the time of the commission of the alleged crime.

"In addition, a person whose life or safety has been previously threatened . . . by [another] . . . is justified in acting more quickly and taking harsher measures for self protection from an assault by [that person] . . ., than would a person who had not received threats from . . . the same person. . . ."

Appellant argued that there was sufficient evidence of perfect self-defense to warrant this instruction.  The trial court found that the evidence would not support a finding of perfect self-defense, and therefore denied the request.

It is well settled that, upon a defendant's request, and when supported by substantial evidence, the trial court must instruct that the jury may consider "the effect of the victim's antecedent threats and assaults against the defendant on the reasonableness of [the] defendant's conduct. [Citations.]" (People v. Garvin (2003) 110 Cal. App. 4th 484, 488; accord, People v. Gonzales (1992) 8 Cal. App. 4th 1658, 1663-1664.)  Respondent asserts that CALJIC No. 5.50.1 is inapplicable to the present case, not only because Daniels was not in fact appellant's victim, but also because this instruction is not applicable to cases involving imperfect self-defense.  It is true that CALJIC No. 5.50.1 discusses a defendant who "actually and reasonably believed" he or she was in danger, and most cases deal only with the effect of antecedent threats on a perfect self-defense claim.

On the other hand, the recently promulgated CALCRIM instruction on imperfect self-defense includes the following bracketed paragraphs: "[If you find that [the victim] threatened or harmed the defendant [or others] in the past, you may consider that information in evaluating the defendant's beliefs.]

"[If you find that the defendant knew that [the victim] had threatened or harmed others in the past, you may consider that information in evaluating the defendant's beliefs.]" (CALCRIM No. 571 (new Jan. 2006).)

Even assuming that appellant was entitled to have the jury instructed with CALJIC No. 5.50.1 in support of imperfect self-defense (and that he did not waive this issue by basing his request in the trial court solely on perfect self-defense), we nonetheless find that any error was harmless. (See Gonzales, 8 Cal. App. 4th at 1664-1665 [trial court's failure to give requested instruction on effect of antecedent assault was harmless].) As in Gonzales, counsel "thoroughly aired this subject in argument." (Id. at 1664.) Also as in Gonzales: "The concept at issue here is closer to rough and ready common sense than abstract legal principle. It is also fully consistent with the otherwise complete [imperfect] self-defense instructions given by the court. It is unlikely the jury hearing the evidence, the instructions given and the argument of counsel would have failed to give [appellant's] position full consideration." (Id. at 1665, fn. omitted.) Appellant plainly cannot show that he was prejudiced by the court's refusal to give the requested instruction regarding antecedent threats, under any standard. (See Chapman v. California (1967) 386 U.S. 18, 24; People v. Watson (1956) 46 Cal. 2d 818, 835-836.)

        2. Heat of Passion

Appellant requested a heat of passion instruction, CALJIC No. 8.42, which provides in relevant part: "The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinarily reasonable person in the same circumstances. A defendant is not permitted to set up [his][her] own standard of conduct and to justify or excuse [himself] [herself] because [his][her] passions were aroused unless the circumstances in which the defendant was placed and the facts that confronted [him][her] were such as also would have aroused the passion of the ordinarily reasonable person faced with the same situation. . . .

"The question to be answered is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from passion rather than from judgment."

Defense counsel argued that the expert witness testimony regarding appellant's emotional and neuropsychological impairments supported a heat of passion instruction because it showed appellant was acting under an emotional state that negated malice.  The court ultimately denied the request, finding that a heat of passion instruction did not apply to the factual scenario of the case in terms of the evidence that had been presented.

Voluntary manslaughter is defined as "'the unlawful killing of a human being without malice.' ([Pen. Code,] § 192.)  A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"-the unreasonable but good faith belief in having to act in self-defense [citations].' [Citation.]" (<u>People v. Lasko</u> (2000) 23 Cal. 4th 101, 108.)

In the present case, the trial court instructed on imperfect self-defense, which focuses on a defendant's subjective, unreasonable fears.  The court correctly found, however, that a heat of passion instruction was not warranted given the lack of evidence that appellant's "'reason was actually obscured as the result of a strong passion aroused by a *provocation*" sufficient to cause an "'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection*, and from this passion rather than judgment.'" [Citation.]" (<u>People v. Lasko</u>, 23 Cal. 4th at 108, italics added; CALJIC No. 8.42.)  Indeed, the expert testimony portrayed appellant as suffering from mental impairments that clouded his reason and caused him to overreact to a perceived threat.

Because the evidence did not support a finding that appellant's situation was such "as also would have aroused the passion of the ordinarily reasonable person faced with the same situation" (CALJIC No. 8.42), the court properly refused to give a heat of passion instruction. (<u>See</u> <u>People v. Garvin</u>, 110 Cal. App. 4th at 489.)

    3. Imperfect Self-Defense

Appellant requested that the court give the jury CALJIC No. 5.17, on imperfect self-defense. FN24  Defense counsel later asked that the third paragraph of the instruction be deleted. That paragraph provides: "[However, this principle is not available, and malice aforethought is not negated, if the defendant by [his][her] [unlawful] [or] [wrongful] conduct created the circumstances which legally justified [his][her] adversary's [use of force], [attack] [or] [pursuit].]" FN25 The court said that it believed this paragraph might be applicable, based on appellant's shooting of Tamara Daniels with a BB gun which, under appellant's theory, eventually led

United States District Court
For the Northern District of California

to the shooting.  The court ultimately gave the complete instruction.

> FN24 Imperfect self-defense is also referred to as "unreasonable" self-defense.

> FN25 CALJIC No. 5.17 provides in full: "A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of murder.  This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief.  Such an actual but unreasonable belief is not a defense to the crime of [voluntary] [or] [involuntary] manslaughter.

> "As used in this instruction, an 'imminent' [peril] [or] [danger] means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer.

> "[However, this principle is not available, and malice aforethought is not negated, if the defendant by [his][her] [unlawful] [or] [wrongful] conduct created the circumstances which legally justified [his][her] adversary's [use of force], [attack] [or] [pursuit].]

> "[This principle applies equally to a person who kills in purported self-defense or purported defense of another person.]"

Appellant argues that the trial court erred in giving the third paragraph of CALJIC No. 5.17 because its language is "overbroad, ambiguous, and misleading," specifically asserting that this paragraph "gives the erroneous impression that the doctrine of imperfect self-defense is not applicable if the defendant has committed any sort of wrongful or unlawful act, and what type of unlawful or wrongful act will suffice to deprive him of the defense is left to the unguided speculation of jurors." FN26

> FN26 Appellant notes that this paragraph has been omitted from the new CALCRIM instruction on imperfect self-defense. (See CALCRIM No. 571 (new Jan. 2006).)

The paragraph in question is taken from language in In re Christian S. (1994) 7 Cal. 4th 768, 773, footnote 1, and, although that language was dictum, our Supreme Court has since reiterated the same principle. (People v. Seaton (2001) 26 Cal. 4th 598, 664, ["Because, however, defendant's testimony showed him to be the initial aggressor and the victim's response legally justified, defendant could not rely on unreasonable self-defense as a ground for voluntary

manslaughter"].) CALJIC No. 5.17 correctly states California law.

Appellant further argues that even if the instruction was proper, the court had a sua sponte duty to define "wrongful conduct" for the jury since that phrase "has a specialized meaning which would not be readily understood by jurors." . . . We disagree. The instruction itself set the context and made clear that appellant's "unlawful or wrongful conduct" must have "created the circumstances which legally justified his adversary's use of force, attack or pursuit." (CALJIC No. 5.17.) The instruction also made clear that the jury had to determine whether appellant was the initial aggressor and, if so, to take that into consideration in determining his culpability. Thus, taken as a whole, the instruction is not impermissibly vague and the court did not err in denying appellant's request to omit the third paragraph.

Pratcher, 2009 WL 2332183, at *31-33.

B. Analysis

1. Federal Authority

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'"). The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Estelle, 502 U.S. at 72; Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995).

Due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quoting California v. Trombetta, 467 U.S. 479, 485 (1984)). Therefore, a criminal

**United States District Court**
For the Northern District of California

defendant is entitled to adequate instructions on the defense theory of the case.  Conde v. Henry, 198 F.3d 734, 739 (9th Cir. 2000).  However, due process does not require that an instruction be given unless the evidence supports it.  Hopper v. Evans, 456 U.S. 605, 611 (1982); Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005).  The defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory.  United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996).

The omission of an instruction is less likely to be prejudicial than a misstatement of the law.  Walker v. Endell, 850 F.2d 470, 475-76 (9th Cir. 1987) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)).  Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'"  Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson, 431 U.S. at 155).

A habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht, 507 U.S. at 637.

### 2. Antecedent Threat Instruction

The evidence in Petitioner's case does not support the antecedent threat instruction, which pertains to threats by the victim.  Petitioner's victim, Kelly, did not threaten or harm Petitioner in any way and was shot while he was sitting in his car.  Thus, the trial court's refusal to give this instruction did not violate Petitioner's due process rights to present his defense.

41

United States District Court
For the Northern District of California

1   See Hopper, 456 U.S. at 611 (due process does not require an

2   instruction be given unless the evidence supports it).

3       Even if the exclusion of this instruction amounted to a

4   constitutional violation, Petitioner has not shown prejudice.  The

5   Court of Appeal found that there might have been sufficient

6   evidence to warrant giving the antecedent threat instruction, but

7   concluded that "it was not reasonably likely that the jury, hearing

8   the evidence, arguments, and instructions, would have failed to

9   give the defense position full consideration" and that, under the

10  standard articulated in Chapman v. California, 386 U.S. 18, 24,

11  (1967), the error caused no prejudice.  Under Chapman, "before a

12  federal constitutional error can be held harmless, the court must

13  be able to declare a belief that it was harmless beyond a

14  reasonable doubt."  Id.

15      As noted by the Court of Appeal, the jury had been given the

16  complete instruction on imperfect self-defense, which provides, in

17  relevant part that, "a person who kills another in the actual but

18  unreasonable belief in the necessity to defend against imminent

19  peril to life or great bodily injury, kills unlawfully but does not

20  harbor malice aforethought and is not guilty of murder. . ."  The

21  jury heard evidence that Daniels had threatened Petitioner, that

22  Petitioner was fearful that Daniels would come after him to

23  seriously harm or kill him and that Petitioner's PTSD aggravated

24  this fear.  Thus, the jury had all the evidence necessary to apply

25  the imperfect self-defense instruction, even without the antecedent

26  threat instruction.  The Court of Appeal found that, under these

27  circumstances, any instructional error was harmless beyond a

28  reasonable doubt.  This Court finds that, under the less stringent

United States District Court
For the Northern District of California

Brecht standard of prejudice, which applies in federal habeas
proceedings, any instructional error did not have a substantial and
injurious effect or influence on the jury's verdict.  See Walker,
850 F.2d at 475-76 (omission of an instruction less likely to be
prejudicial than a misstatement of the law).

### 3. Heat of Passion Instruction

The heat of passion instruction Petitioner requested would
reduce homicide to manslaughter if the jury found Petitioner's
passion was such that would be aroused in the mind of an ordinarily
reasonable person in the same circumstance.  As noted by the state
court, Petitioner's defense of imperfect self-defense focused on
his subjective, unreasonable fear of Daniels.  The Court of Appeal
reasonably found that the evidence supported the imperfect self-
defense theory but did not support a finding that Petitioner's
situation would have aroused the passions of an ordinarily
reasonable person confronted with the same situation.  Even
assuming that Petitioner thought Kelly, the victim, was Daniels,
Petitioner shot Kelly while he was sitting in a car, doing nothing
to provoke Petitioner.  Because the passions of a reasonable person
would not have been aroused under such circumstances, the Court of
Appeal reasonably denied this claim.  See Hopper, 456 U.S. at 611
(no due process violation where requested instruction not supported
by the evidence).

### 4. Amendment to Imperfect Self-Defense Instruction

Petitioner's claim that the trial court should have deleted the
third paragraph of the imperfect self-defense instruction because
it is overbroad, ambiguous and misleading was reasonably denied by
the Court of Appeal on the ground that the challenged language was

taken from the California Supreme Court opinion, <u>In re Christian</u> <u>S.</u>, 7 Cal. 4th 768, 773 n.1 (1994) and, thus, correctly stated California law. <u>See</u> <u>Wainwright v. Goode</u>, 464 U.S. 76, 84 (1983) (ruling of state's highest court regarding state law is binding on federal courts); <u>Bains v. Cambra</u>, 204 F.3d 964, 972 (9th Cir. 2000) (on habeas review, federal courts bound by state court's interpretations of state law). Furthermore, considering the third paragraph in the context of the imperfect self-defense instruction as a whole, the Court of Appeal reasonably found that it was not impermissibly vague, ambiguous or overbroad. <u>See</u> <u>Del Muro</u>, 87 F.3d at 1081 (defendant not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory).

Accordingly, the Court of Appeal's denial of Petitioner's instructional error claim was not contrary to or an unreasonable application of Supreme Court authority.

V.  Prosecutorial Misconduct Claim

Petitioner claims that the prosecutor committed misconduct, during cross-examination of witnesses and closing argument, which violated his rights to due process and a fair trial.

A.  Court of Appeal Decision

1. Cross-Examination

a. Trial Court Background

The Court of Appeal found as follows.

During cross-examination of defense expert Dr. Myla Young, the prosecutor asked several questions about what, if anything, Dr. Young had read related to the crime before interviewing appellant.  After Dr. Young responded in the affirmative to the question, "You didn't read anything about the facts of the crime before you talked with the defendant?" the prosecutor asked, "Look at the probation report?"  Defense counsel

objected and asked to approach.  After a sidebar conference,
the court admonished the jury to disregard the last question
and struck it from the record.  At the next recess, defense
counsel observed that the court had directed the parties not to
mention the fact that appellant was on probation prior to
committing the present offense.  Counsel asked for a mistrial.
The prosecutor responded that he was not asking about the
probation report in terms of the prior gun charge, but about
the probation report prepared for this case.  The trial court
stated that asking about the probation report should have been
discussed first outside of the presence of the jury because lay
people often have a misperception about what the term
"probation" means.  The court concluded by stating that it had
admonished the jury and that the prosecutor's question did not
rise to the level of a mistrial.

During cross-examination of Dr. Howard Friedman, the prosecutor
asked, in the context of the diagnosis of PTSD, "Would you
agree that writing about incidents of violence–" FN27 at which
point defense counsel objected.  The court sustained the
objection and told the jury to "[d]isregard that portion."  The
court then refused defense counsel's request to approach and
told the prosecutor to "move on."

   FN27 This reference was apparently to appellant's rap
   lyrics.

A short time later, the prosecutor was asking Dr. Friedman
about factors that were relevant to him in deciding whether
appellant suffered from PTSD, and asked "[B]ut if you had
information that he knew who the person was, that he got the
gun after finding out who the person was and shot him multiple
times, wouldn't that be possibly inconsistent with post
traumatic stress disorder?"  Defense counsel objected and asked
to approach.  The court announced the mid-morning recess and,
after the jury left the courtroom, it stated that, during in
limine motions, it had told both counsel not to raise the issue
of appellant's rap lyrics or his prior gun possession in front
of the jury without first raising it with the court.  Defense
counsel claimed this was part of a pattern of conduct by the
prosecutor.  The court responded, "I think I could spend the
rest of the day critiquing for each of you how I think this
should go and how I think it's going.  That's not for me to do.
. . ."

Later during the cross-examination of Dr. Friedman, the
prosecutor asked, "After he lied to the police officers, they
convinced him that they had sufficient evidence that might tie
him up to the crime, he decided not to talk to them anymore;
isn't that true?"  Defense counsel objected and asked to
approach.  After a sidebar conference, the prosecutor asked,
"Doctor, like I said, once the officers told him that they had
the evidence to link him to the murder, gray beanie, the
defendant didn't want to talk anymore; right?"  Defense counsel
objected again, "based on the Court's ruling."  The court

45

United States District Court
For the Northern District of California

responded, "Rephrase, please.  The jury will disregard the last question and answer."  A few questions later, the prosecutor asked, "Once someone tells the defendant that they've got sufficient information that ties him to the scene after his denial of having been there, isn't it reasonable to say 'I don't want to talk anymore'-terminate the conversation I should say?"  Defense counsel objected on relevance grounds and the court sustained the objection.

During subsequent recross-examination of Dr. Friedman, the prosecutor asked, "About my contacting you, on August 25th, I was sent a copy of your results and every statement that the defendant made was blacked out?"  The court sustained defense counsel's objection and granted his request to strike the question.

Later, after confirming that Dr. Friedman had testified that he had not told appellant what the tests were about before giving them to him, the prosecutor asked, "Do you know if the Defense counsel told him that or not?"  The court sustained defense counsel's objection and, when counsel asked to approach, excused the jury.  Defense counsel argued that the question constituted misconduct because it implied that the defense fabricated a defense.  "The bottom line is Mr. Brown is suggesting that I coached my client, told him about PTSD, gave him information to allow him to perform the tests appropriately.  That is an absolutely flagrant, unsubstantiated, improper attack on the integrity of Defense counsel."  Counsel moved for a mistrial.

The court said it would look at cases cited by defense counsel and, during a subsequent conference outside the presence of the jury, defense counsel further argued that the question, by asking about communications between counsel and his client, went to privileged information.  Counsel further argued that the question went to "the heart of the defense; namely, whether or not [appellant] fabricated this defense at the behest of Defense counsel. . . ."  The court stated that it believed the question was improper because it implied that appellant had found out what the test was about and that, "with that knowledge, you could by your answers, tinker with the results."  The court, however, further stated, "Unlike the cases that we have here, that was the beginning and end of the comment though.  I think that it was an improper question.  Had it gone further, I think it would clearly be misconduct."  The court further found that an admonition would be sufficient and that a mistrial was not called for.

The court later admonished the jury: "There was a question yesterday by the Prosecutor of the doctor regarding whether the doctor knew whether [defense counsel] had spoken to his client about a subject matter.  It's not a proper question.  I've stricken it from the record.  You're not to consider that if you find that in your notes."

46

A short time later, the prosecutor asked the court to tell the jury that there were times the prosecution was not allowed to speak with a defense witness.  Defense counsel responded that the prosecutor had "repeatedly throughout the trial suggested through innuendo materials were not provided to him, he didn't have opportunities to speak with experts."  Counsel asked that, if the court was going to instruct the jury at all, that it tell them the prosecutor "was given everything in a timely manner and according to the law." FN29

> FN29 This instance of claimed misconduct does not involve a particular question by the prosecutor, but more generally concerns alleged improper insinuations related to discovery during the prosecutor's questioning of various witnesses.

The court subsequently admonished the jury: "There were a couple of questions back and forth about materials being provided from one side or the other and talking to, in particular, experts by one attorney or the other.  In general terms, let me tell you that there are certain requirements, laws, procedures that dictate the exchange of information between the parties, and when attorneys may speak with an opposing side's expert witnesses and when they may not. [¶] Those are not matters for your consideration in any way, shape or form.  If there's been mention of that or implication in the questions by either side, it's not a matter for your consideration, not an issue in this case." FN30

> FN30 Earlier, the court had similarly admonished the jury at the request of the prosecutor, after defense counsel had asked Dr. Friedman on direct examination whether he had spoken with the prosecutor before trial.

b. Court of Appeal Analysis

The Court of Appeal concluded as follows.

It is misconduct for counsel to refer to facts not in evidence. (People v. Hill, 17 Cal. 4th 800, 828.)  A prosecutor also commits misconduct if he or she attacks the integrity of defense counsel. (Id. at 832.)

In the present case, even assuming all of the complained of questions constituted misconduct, in light of the relatively minor nature of the improper questions in the context of a lengthy trial, as well as the response of the trial court, striking many answers and/or admonishing the jury, we conclude that appellant was not prejudiced by the alleged misconduct. (See People v. Hill, 17 Cal. 4th at 819.)

First, in context, the prosecutor's question to Dr. Young regarding the probation report clearly was referring to the present case and, even if the jury was confused by the his use of the word "probation," the jury already had information that

appellant previously had been arrested for gun possession. Next, the question to Dr. Friedman regarding "writing about incidents of violence" was cut off before the jury could have any sense of where the prosecutor was going with the question. Moreover, the court admonished the jury to disregard the question, and the jury ultimately heard some of appellant's rap lyrics. Next, regarding the question about whether appellant knew who the person was before he shot him, the jury also had heard testimony from Dr. Young-although not admitted for its truth-that suggested appellant could have learned of the victim's identity after his brother approached and spoke with Kelly just before the shooting.

Next, regarding the prosecutor's questions to Dr. Friedman about appellant's decision to stop talking to police once he believed they had evidence tying him to the crime, it is not clear that the prosecutor was violating the court's ruling at the sidebar conference, which was not reported, given that the trial court twice sustained objections to this question on relevance grounds, once telling the prosecutor to rephrase. Moreover, even if it was misconduct, it was minor.

Next, regarding both the prosecutor's question to Dr. Friedman about whether he initially gave the prosecutor a copy of his report with all of appellant's statements blacked out and defense counsel's general complaint that the prosecutor had insinuated that counsel had not provided certain materials to him or had kept him from speaking to the experts, these slight instances of misconduct, if indeed they were misconduct, were cured by the trial court's admonition to the jury that discovery-related matters were not an issue in the case and were not to be considered "in any way, shape or form."

Finally, the court found improper the prosecutor's question regarding whether Dr. Friedman knew if defense counsel had told appellant what the tests were about, but the court did not seem to believe it was misconduct.  We conclude that, even if it was misconduct, it did not prejudice appellant given that the court immediately sustained defense counsel's objection and subsequently admonished the jury that it had been an improper question, it had been stricken from the record, and the jury should not consider it.

We do not condone the prosecutor's several failures-whether inadvertent or intentional-to abide by the trial court's in limine rulings.  But again, in light of the relatively minor nature of the improprieties in the context of a very long trial and the trial court's swift action in sustaining objections and/or admonishing the jury, we do not believe appellant was prejudiced by the prosecutor's questions, under either state or federal standards. (See People v. Hill, 17 Cal.4th at 819.)

2. Closing Argument

During closing argument, the prosecutor used an example to illustrate how premeditation and deliberation could occur in a few seconds.  The example he used was the snap decision a driver makes whether to go through a yellow light.  Defense counsel objected on the grounds that the argument misstated the law and lowered the prosecution's burden of proof.  The trial court told the jury that the instructions on the law come from the court and, if the attorneys' arguments differed from the instructions, the jury was to follow the instructions.  The prosecutor then finished his example of premeditation based on a driver's decision in response to a yellow traffic light.

The Court of Appeal concluded as follows.

> It is misconduct for a prosecutor to misstate the law by attempting "'to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements.'" (People v. Hill, 17 Cal. 4th at 829-830.)  In evaluating a claim of prosecutorial misconduct based on a prosecutor's comments to the jury, we must determine whether "'there is a reasonable possibility that the jury construed or applied the prosecutor's comments in an objectionable manner.' [Citations.]" (People v. Valdez (2004) 32 Cal. 4th 73, 132-133; People v. Berryman (1993) 6 Cal. 4th 1048, 1072.)
>
> We do not agree with appellant's portrayal of the prosecutor's comments as trivializing the concepts of premeditation and deliberation.  As the prosecutor said, he was merely using a real-life situation to attempt to explain the sort of short timeframe within which premeditation and deliberation can occur.  These comments did not constitute misconduct. (See People v. Hill, 17 Cal. 4th at 819-820.)

Pratcher, 2009 WL 2332183, at *34-39.

B. Analysis

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." Darden v. Wainwright, 477 U.S. 168, 181 (1986).  Under Darden, the

United States District Court
For the Northern District of California

first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. <u>Tan v. Runnels</u>, 413 F.3d 1101, 1112 (9th Cir. 2005). Even if the prosecutor's actions constituted misconduct, when a curative instruction is issued, the court presumes that the jury has disregarded inadmissible evidence inadvertently presented to it and that no due process violation occurred. <u>Greer v. Miller</u>, 483 U.S. 756, 766 n.8 (1987); <u>Darden</u>, 477 U.S. at 181-82 (the Court condemned egregious, inflammatory comments by the prosecutor but held that the trial was fair because curative instructions were given by the trial court).

Other factors which the court may take into account in determining whether prosecutorial misconduct rises to the level of a due process violation are (1) the weight of the evidence of guilt, <u>United States v. Young</u>, 470 U.S. 1, 19 (1985); (2) whether the misconduct was isolated or part of an ongoing pattern, <u>Lincoln v. Sunn</u>, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct related to a critical part of the case, <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972); and (4) whether the prosecutor's comment misstated or manipulated the evidence, <u>Darden</u>, 477 U.S. at 182.

Improper questioning of a witness by the prosecutor is not alone sufficient to warrant reversal. Rather, the relevant inquiry on habeas is that dictated by <u>Darden</u>, 477 U.S. at 181, i.e., whether the prosecutor's behavior so infected the trial with unfairness as to make the resulting conviction a denial of due process. <u>Ortiz v. Stewart</u>, 149 F.3d 923, 934 (9th Cir. 1998). Even when separate incidents of prosecutorial misconduct in the

questioning of witnesses "do not independently rise to the level of reversible error, the cumulative effect of multiple errors can violate due process." Wood v. Ryan, 693 F.3d 1104, 1116 (9th Cir. 2012) (quotation marks and brackets omitted).

Even if prosecutorial misconduct occurred, habeas relief is unavailable unless the error had a substantial and injurious effect or influence on the jury's verdict. Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) (citing Brecht, 507 U.S. at 637).

The Court of Appeal assumed that the prosecutor's questions at issue constituted misconduct, but found that they were not prejudicial in light of the minor nature of the improper questions in the context of a lengthy trial and the quick response of the trial court, striking the question or answer and admonishing the jury. The Court of Appeal's conclusion is reasonable.

As noted by the Court of Appeal, each time the prosecutor asked one of the questions Petitioner challenges, the trial court responded immediately to remedy any improper conduct. Under established federal authority, even if the prosecutor commits misconduct, when a curative instruction is issued, the court presumes that the jury has disregarded inadmissible evidence inadvertently presented to it and that no due process violation occurred. See Greer, 483 U.S. at 766 n.8. For this reason alone, the prosecutor's improper questions do not constitute a due process violation. Second, as the Court of Appeal reasonably concluded, the improper questions had relatively minor effect in the context of a lengthy trial that lasted approximately thirty-five days.

The most egregious of the conduct complained of was the prosecutor's question to psychologist Dr. Friedman whether he knew

1  if defense counsel had informed Petitioner about the nature of the

2  psychological tests.  This implied that counsel had fabricated a

3  defense and called for the revelation of privileged attorney-client

4  communications.  However, defense counsel objected before Dr.

5  Friedman could reply, and the trial court immediately sustained the

6  objection and later admonished the jury that the prosecutor's

7  question was improper and the court had stricken it from the

8  record.  Because the trial court immediately took corrective

9  action, this question does not constitute a due process violation.

10      Furthermore, as pointed out by the Court of Appeal, the jury

11 did not learn anything from the challenged questions that was not

12 revealed in another context.  Although the cumulative effect of

13 several errors may result in actual prejudice, the facts pertaining

14 to this claim do not support such a conclusion.  Based on the

15 totality of the circumstances, the prosecutor's challenged

16 questions did not have a substantial or injurious effect or

17 influence on the jury's verdict.

18      With respect to Petitioner's claim that, during closing

19 argument, the prosecutor misstated the law of premeditation, the

20 Court of Appeal reasonably found that the prosecutor's use of a

21 real-life situation to help illustrate the concepts of

22 premeditation and deliberation did not misstate the law and, thus,

23 did not constitute misconduct.  See Bains, 204 F.3d at 972 (federal

24 habeas court bound by state court's interpretation of state law).

25      Based on the above, the Court of Appeal's denial of

26 Petitioner's claim of prosecutorial misconduct was not contrary to

27 or an unreasonable application of established federal authority or

28 an unreasonable finding of the facts in light of the state record.

VI. Juror Misconduct

    A.   Court of Appeal Decision

        1. Trial Court Background

The Court of Appeal found as follows.

After the jury rendered its verdict, but before sentencing, appellant moved for a new trial, based, inter alia, on alleged misconduct by Juror No. 6.  In support of the motion, appellant submitted a declaration from defense counsel, declarations from two jurors who served on the jury with Juror No. 6, and a declaration from a defense investigator who had talked to another juror.  In his declaration, defense counsel stated that he became aware, through several interviews with jurors, that Juror No. 6 had "failed to disclose during voir dire that he had been the victim of a drive-by shooting at a barbershop at some point in the past, and that he communicated this information to the jury during deliberations."  Defense counsel further stated that, had he known about this incident, he would have questioned Juror No. 6 further and might have asked the trial court to remove the juror for cause or might have exercised a peremptory challenge against him.

Juror No. 4 stated, in his/her declaration, that Juror No. 6 had told the jury near the end of deliberations that "[h]e grew up in a tough neighborhood in Hunter's Point, San Francisco. He understood that most jurors did not have this experience. When he was younger he was the victim of a drive-by shooting. He was present in a barbershop waiting for a haircut when a car drove by and sprayed bullets into the shop.  He was lucky not have been hit.  [Juror No. 6] did not state whether anyone in the shop was hit.  [Juror No. 6] told the jury that he was relating this experience to show that one can grow up in a violent neighborhood and still make positive choices, as he had done, and that living in such a neighborhood was not an excuse for criminal behavior.  He did not want the other jurors to think he was an expert on the subject. [¶] [Juror No. 6] described this experience toward the end of jury deliberations, prior to the jury reaching its verdict."  Juror No. 7's declaration recounted the same incident in very similar words. Finally, in his declaration, defense investigator Doug Henley stated that he had spoken on the telephone with Juror No. 10, who told him that Juror No. 6 "had made . . . statements about being a victim of some kind of shooting in Hunter's Point.  I asked her why he said that, and she stated they were a very forthright and honest jury.  She believed the shooting experience was a factor for him in reaching a decision in the case."

Before trial, Juror No. 6 had filled out a questionnaire, in which he answered "no" to the following two questions: Question

No. 13, which asked, "Have you, a family member, close friend, or significant other been a victim, witness, or defendant in a criminal matter?" and question No. 32, which asked, "Have you, a family member, or close friend ever been the victim of a shooting or another type of serious physical assault?"

After argument on this issue, the court ruled as follows: "I think there are two ways to look at this.  I think that reasonably the Court could find that there has been no misconduct because there is insufficient evidence one way or the other to show that the omission by the juror of the information was deliberate and there is just a lack-there is just as much of a lack of information that it was honest but inadvertent.  And I think that the Court could find that there is not sufficient evidence of misconduct based on that, what has been presented.

"I think the Court could also reasonably find that there could be misconduct, that information should have been disclosed.  The question on the questionnaire was sufficient to put the juror on notice that they [sic] should have disclosed that, but then the question becomes, is there prejudice?  In my opinion there is just not enough evidence from what has been presented to find that there is prejudice.  I could find either way.  I think the conclusion is the same, that either there is no misconduct and we don't move further or even if there is misconduct, there is no prejudice and we end up at the same place.

"On the record in front of me presented on the motion for new trial, I do not believe that there is a sufficient basis to overturn the verdict of the jury.  Deny the motion for new trial on that issue."

       2. Analysis

The Court of Appeal Concluded as follows.

"We begin with the basic proposition that one accused of a crime has a constitutional right to have the charges against him or her determined by a fair and impartial jury. [Citations.]  A prospective juror's ability to be fair and impartial is explored during the process of voir dire. . . . 'A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct. [Citations.]' [Citations.]"  (People v. Duran (1996) 50 Cal. App. 4th 103, 111-112.)

. . .

We need not address the trial court's alternative ruling that any misconduct was not prejudicial because we conclude that the evidence presented does not establish misconduct.  First, in comparing question No. 13 in the juror questionnaire with the

statement Juror No. 6 made during deliberations, this question does not appear-even to us-to apply to the situation he described in this juror's comment.  This question was included with a number of questions under the heading, "Criminal Justice System," and the question itself, regarding whether the juror had been a victim or witness in a criminal matter plainly referred to official criminal matters such as those involving police or the court system.  Nothing in the declarations submitted suggested that the shooting Juror No. 6 witnessed had led to his involvement in the criminal justice system.

Next, question No. 32 asked whether the juror or anyone close to him had "ever been the victim of a shooting or another type of serious physical assault."  While this question might have applied to Juror No. 6's experience at the barber shop, it is arguably ambiguous as to whether someone who was in a barbershop when bullets sprayed the shop-who was not actually shot and there was no indication that he was a target-would consider himself a "victim" as used in this question, rather than a bystander or witness.  Given that appellant did not present evidence directly from Juror No. 6 regarding his reasons for answering question No. 32 as he did, and without undue speculation on our part about his possible thought processes, we cannot conclude that any omissions on the questionnaire or during voir dire were intentional, rather than inadvertent. (See <u>Hamilton</u>, 20 Cal. 4th at 300.)

In sum, the evidence is insufficient to prove that Juror No. 6 committed misconduct or was actually biased.  (See <u>Duran</u>, 50 Cal. App. 4th at 113.).

<u>Pratcher</u>, 2009 WL 2332183, at *38-41 (footnote omitted).

B. Analysis

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors.  U.S. Const. amend. VI; <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961).  "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." <u>Tinsley v. Borg</u>, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotations omitted).

However, the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation." <u>Smith v. Phillips</u>, 455 U.S. 209, 217 (1982).  The safeguards of juror impartiality, such as voir dire and protective

instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.  Id. Although it is improper for jurors to decide a case based on personal knowledge of facts specific to the litigation, "jurors may bring their life experiences to a case." Mancuso v. Olivarez, 292 F.3d 939, 950 (9th Cir. 2002).

Juror bias may be shown, and a new trial obtained, when the evidence shows that a juror failed to answer a voir dire question honestly and, had he answered correctly, the information would have provided a basis for a challenge for cause.  McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984); see also Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc) (new trial may be obtained by showing: (1) the juror failed to answer honestly a voir dire question, and (2) this undermined the impartiality of the petitioner's jury).  A pattern of lies, inappropriate behavior and attempts to cover up this behavior may well introduce "destructive uncertainties" into the fact-finding process and require that bias be presumed.  Green v. White, 232 F.3d 671, 676-78 (9th Cir. 2000).  However, a juror's mistaken, though honest, response to a voir dire question, without a showing that a correct answer would be basis for a challenge for cause, does not provide grounds for a new trial.  McDonough, 464 U.S. at 555.

The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of the trial.  Id. at 556.  Forgetfulness, for example, does not indicate lack of impartiality.  United States v. Edmond, 43 F.3d 472, 473-74 (9th Cir. 1994) (no misconduct where

district court found juror's testimony that he forgot about being

victim of armed robbery truthful).

The trial court held a hearing during which it questioned

whether it had the authority to call in Juror Number 6 to determine

why he had answered "no" to the questions at issue.  After

consideration, the court concluded that it was defense counsel's

burden to put all relevant evidence before the court and the court

must make its decision based on the submitted evidence.  The court

concluded that the three declarations defense counsel had submitted

failed to provide sufficient evidence to show that Juror Number 6

had answered "No" to questions 13 and 32 for an improper reason.

Ex. C, Reporter's Transcript on Appeal (RT App.) at 4804-06.

The Court of Appeal reasonably concluded that question 13 did

not apply to Juror Number 6's experience because it was directed at

official criminal justice system matters that involved police or

the courts and that there was no showing that the shooting Juror

Number 6 witnessed became a criminal justice system matter.

The Court of Appeal reasonably found question number 32

ambiguous because Juror Number 6, who was not shot and was not a

target of the shooting, may not have considered himself to be a

"victim," rather than a bystander or a witness.

Petitioner argues that the Court of Appeal's finding that Juror

Number 6 might have honestly thought he was not a "victim" was

unreasonable.  For support, Petitioner cites declarations of other

jurors and the defense investigator which indicated that Juror

Number 6 referred to himself as a victim in this situation.

However, as pointed out by the Court of Appeal, none of the

declarations directly quoted Juror Number 6 and, thus, it was not

United States District Court
For the Northern District of California

clear that Juror Number 6 used the precise words in the
declarations.  <u>Pratcher</u>, 2009 WL 2332183, at *41 n.31.  The Court
of Appeal rejected as speculation Petitioner's assumption that
Juror Number 6 used the word "victim" in describing his experience.
On habeas review, this finding of fact by the state court is
presumed to be correct.  The Court of Appeal also found that, even
if Juror Number 6 later described himself as a "victim," the
evidence did not show that his earlier answer hid actual bias, but
showed that Juror Number 6 may not have understood that his
situation required an affirmative answer to question number 32.
This conclusion by the appellate court is reasonable.  <u>See</u>
<u>McDonough</u>, 464 U.S. at 555 (juror's mistaken, though honest,
response to a voir dire question, without more, does not provide
basis for a new trial).

Petitioner also argues that Juror Number 6 must have realized
he was a "victim" within the meaning of question 32 because, in
answer to the question, many other jurors related violent
experiences in which they were not the actual victim.  However, a
review of the incidents listed by Petitioner, <u>see</u> Petition at 25-
28, reveals that the incidents related by the jurors involved
violent crimes directed at a relative or friend.  These incidents
squarely fit within the meaning of questions 13 and 32 and are
distinguishable from the incident experienced by Juror Number 6.
Juror Number 10 was the only juror who related a similar incident,
where police officers accidentally shot bullets into her apartment
while apprehending a suspect.  Petition at 23.  She related the
incident first in response to question number 13.  In response to
question number 32, she stated, "Yes.  Indirectly in the case

United States District Court
For the Northern District of California

previously stated--in October 1999 Antioch police accidently [sic] shot into my apartment when apprehending a suspect.  No one in my home was hit. . . ."  Petition at 23.  Because Juror Number 10 subsequently served as a witness against the police department, this incident involved the criminal justice system, placing it within the scope of question number 13.  In answering question 32, she conditioned her response by saying she was an "indirect" victim.  Even considering Juror Number 10's response, Juror Number 6, who witnessed bullets coming into a barbershop and not into his own home, could have reasonably considered himself to be a bystander or witness and not a victim.

A similar claim was denied by the Supreme Court in <u>McDonough</u>, 464 U.S. at 549-52.  In that case, a juror failed to respond affirmatively to a question whether the juror or any family members had sustained injuries resulting in disability, prolonged pain or suffering.  After trial, it was revealed that the juror's son sustained a broken leg as the result of an exploding tire.  <u>Id.</u> at 549, 555.  Another juror responding to the same question related a minor incident of his six-year-old son catching his finger in a bike chain.  <u>Id.</u> at 555.  Another juror failed to answer the question and only on subsequent questioning related that her husband had been injured in a machinery accident.  <u>Id.</u>  The Court stated:

> The varied responses to respondents' question on voir dire testify to the fact that jurors are not necessarily experts in English usage.  Called as they are from all walks of life, many may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges. . . . Thus, we cannot say, and we doubt that the Court of Appeals could say, which of these three jurors was closer to the "average

juror" in his responses to the question, but it is evident that
such a standard is difficult to apply and productive of
uncertainties.

To invalidate the result of a three-week trial because of a
juror's mistaken, though honest response to a question, is to
insist on something closer to perfection than our judicial
system can be expected to give. . . . [I]t ill serves the
important end of finality to wipe the slate clean simply to
recreate the peremptory challenge process because counsel
lacked an item of information which objectively he should have
obtained from a juror on voir dire examination . . . We hold
that to obtain a new trial in such a situation, a party must
first demonstrate that a juror failed to answer honestly a
material question on voir dire, and then further show that a
correct response would have provided a valid basis for
challenge for cause.  The motives for concealing information
may vary, but only those reasons that affect a juror's
impartiality can truly be said to affect the fairness of a
trial.

Id. at 555-56.

The case relied on by Petitioner, Dyer v. Calderon, 151 F.3d
970 (9th Cir. 1998) is a pre-AEDPA case and, thus, the court did
not apply AEDPA's deferential standards to the state court's
decision.  Id. at 973 n.3 ("The AEDPA does not apply retroactively
to Dyer's appeal.").  Furthermore, the juror misconduct at issue in
Dyer was more egregious than that here.  In Dyer, the juror
answered "no" to question 13, whether she or any of her relatives
or close friends had ever been the victim of a crime, and to
question 15, whether she or any of her relatives or close friends
had been accused of any offense other than traffic cases.  Id. at
972.  After the guilt-phase verdict and before the penalty phase,
the defense learned that the juror's brother had been shot and
killed six years earlier.  Id.  The juror explained that she
answered no to question 13 because she thought the incident was an
accident, not a crime.  Id.  She also said that no one from her
family had ever testified in court.  Id. at 974.  Other information

showed that the incident was not an accident, that the shooter had
been prosecuted for the crime, that the juror lived with her
brother and her mother, that the juror's mother had been a witness
at the preliminary hearing and that the juror was the plaintiff in
a civil suit against her brother's killer. Id. at 974-75. These
facts showed that the juror would have been aware of the
circumstances of her brother's death. Id. Additional evidence
uncovered in the district court showed that the juror had not
revealed other incidents where she had been the victim of a crime
and that her estranged husband had been arrested on charges other
than a traffic case. Id. The Ninth Circuit concluded that these
facts undermined the state trial court's finding that the juror was
honest and unbiased. Id. at 979-81.

Unlike Dyer, there was no significant evidence of the juror's
dishonesty in this case, nor was there a pattern of lying leading
to the presumption of bias. See Green, 232 F.3d at 676-78.

Petitioner, citing the declaration of defense counsel, argues
that, had Juror Number 6 revealed the barbershop incident in
answering the voir dire questions, counsel would have asked him
extensive follow-up questions and, based on the answers, may have
asked the court to remove Juror Number 6 for cause or have
exercised a peremptory challenge against him. 7 CT 1944-45,
Declaration of Jonathan Laba. In support of this argument,
Petitioner cites the trial record which shows that, of all the
jurors who gave positive answers to questions 13 and 32, only one
was ultimately seated as a trial juror.

This argument does not aid Petitioner. As stated by the
Supreme Court, even a mistaken though honest response to a voir

dire question, absent a showing that a correct answer would provide

a basis for a challenge for cause, would not warrant a new trial.

McDonough, 464 U.S. at 555.  Here, no evidence shows that Juror

Number 6 answered the questions dishonestly.  The most counsel can

say is that he would have asked further questions that may have

provided a basis for a cause challenge.  Under McDonough, this is

insufficient to support a motion for a new trial.

     For all these reasons, the Court of Appeal's denial of this

claim was not unreasonable.

VII.  Cruel and Unusual Punishment

     Petitioner contends that his sentence of fifty years to life

violates his constitutional right to be free from cruel and unusual

punishment.

     A. Court of Appeal Decision

          1. Trial Court Background

The Court of Appeal found as follows.

On January 16, 2007, appellant filed a motion to modify his
sentence to manslaughter with use of a firearm, arguing that
the 50-year-to-life sentence that was statutorily required for
his convictions constituted cruel and unusual punishment as
applied.  He also filed a motion requesting a declaration that
his prospective sentence was unconstitutional under the Eighth
Amendment and in violation of international law.

After hearing argument at the sentencing hearing on January 19,
2007, the trial court denied both motions, ruling as follows:

. . .

"The issue before the Court is whether or not the perspective
[sic ] sentence rises to the level that it is unconstitutional
as cruel and unusual punishment.  The 50 years to life sentence
in this case-or enumerated sentence in this case is a
combination of the initial conviction itself, plus the
enhancement, which was found to be true by the jury.

. . . .

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

"The only question for this Court on this particular issue is whether or not that perspective [sic] sentence is unconstitutional, . . .

"In my review of the case law, I don't believe that it is unconstitutional.  I don't believe that there is support for that.  And I don't think that this case is, by its factual scenario, combined with the fact that Mr. Pratcher was 15 at the time, falls in a category of something-or a scenario that is so different from other cases that it makes that super speculative [sic ] sentence unconstitutional.

"So I would deny that motion. . . ."

In imposing sentence, the court discussed in detail appellant's request to reduce his sentence and on his particular circumstances:

"With regard to the evidence in the trial, what-what troubled me through the trial itself, and a lingering feeling that I had throughout was that whether it was Mr. Kelly or the other gentleman, I couldn't get past the feeling that someone was going to get very hurt or die that day.  The circumstances leading up to this, unfortunately, almost guaranteed that.

"To have a shotgun in the hands of someone who was obviously that angry almost guarantees a bad result.  And it happened to be Mr. Kelly who lost his life, but someone was going to lose their life that day or be seriously injured.  You don't fire a rifle at someone and not have something bad happen unless you are really lucky that your shot doesn't hit.

"In the circumstance, the fact that this took place in a crowded neighborhood, the chances of that-those bullets not hurting someone were small.  There was a great deal of planning that went into this.  And the planning that took place did not match the perceived danger.  The actions taken of not only finding the gun, looking for another weapon that was more powerful that was not obtained, hiding the weapon, and shooting at someone sitting in a car who absolutely there is no evidence and there was no suggestion that-whether it was Mr. Kelly or anyone else-but that Mr. Kelly presented a danger or risk in no way, shape or form.  He was merely sitting in the car.

"And whether it was Mr. Daniels or Mr. Kelly, that was true.  The fact that there were four successive shots with a gun that required manipulation to fire those successive shots that occurred, probably led the jury to the first degree murder verdict, but certainly indicated to the Court that this was not an accident or something random.  It was intended.

"The fact that Mr. Pratcher was 15 at the time truly is a tragedy for society, but it doesn't change the outcome and it doesn't change the fact that Mr. Kelly is dead.  Whether it was a 40-year-old, a 30-year-old or the 15-year-old, the end result

is the same.  I agree that we view, in certain circumstances,
someone's age as a factor in evaluating their behavior, but we
also have to evaluate that behavior in terms of the history,
their history and what led up to the event.

"I think Mr. Pratcher started having problems when he moved for
probably a variety of reasons.  And we heard during the in
limine motions, most of which the jury did not hear because I
didn't think it was appropriate for them to consider as part of
their verdict, but I heard about aggressive, violent behavior
that clearly was different than the elementary school, but
clearly was not justifiable and was outwardly aggressive toward
others.

"We can spend all afternoon on what rap music lyrics mean, an
expression or someone's true feelings come out.  I can tell you
that the rap lyrics that I reviewed, all but one line of which
the jury did not hear because I did not think it was
appropriate, were extremely violent.  I'm not convinced that
this is merely the musings of a young person.  There's more on
the level of venting.  I think it is terribly sad that someone
at the age of 15 is feeling that kind of rage, and fixing that
is not going to happen.

"The statutory-in addressing the Defense requests under <u>Dillon</u>
FN32 to reduce the conviction to a lesser offense of second
degree or voluntary manslaughter, the <u>Dillon</u> case stands by
itself.  The case had been cited to me only twice now.  This is
the second time and only recently.  It stands by itself.

FN32 <u>People v. Dillon</u> (183) 34 Cal. 3d 441.

"I've done quite a bit of research.  And there are virtually no
other cases that go where <u>Dillon</u> went.  It stands for the fact,
I think, that the Court has the authority to reduce a
conviction, if appropriate, under the circumstances.

"I don't think that the factual scenario is analogous to our
situation here.  And I truly do not find that the factual
scenario in this case would justify this Court from-to diverge
from the statutorily-mandated sentence for the conviction that
the jury brought in.  I just don't think that it falls in that
category.

"As I said before, I think that there was a lot of thought,
whether misguided or not is separate.  But an awful lot of
thought went into this act and a great deal of coldness to
allow someone to shoot into an occupied car at someone who's
clearly not a threat; and not just once, but four times.  I
think you could even explain the first one in some fashion, but
two, three and four, I don't know how you explain them.

"So I don't believe that a reduction to a lesser-included
offense would be appropriate in this case under the
circumstances."

United States District Court
For the Northern District of California

64

The court then sentenced appellant to 25 years to life on the first degree murder conviction, with a consecutive term of 25 years to life on the Penal Code section 12022.53 firearm use enhancement.

   2. Court of Appeal Analysis

The Court of Appeal concluded as follows.

We, like other courts, are troubled by imposition of lengthy sentences on youthful offenders. (See, e.g., In re Nunez (2009) 173 Cal. App. 4th 709, 727) [concluding that "youth so striking as petitioner's" (14 years old) combined with absence of injury or death to victim raised strong inference that a sentence of life in prison without parole for kidnapping offense constituted cruel and unusual punishment]; People v. Em (2009) 171 Cal. App. 4th 964, 981, (conc. & dis. opn. of Moore, J.) ["A 50-year-to-life term for an immature 15-year-old with an underdeveloped sense of responsibility, who was an aider and abettor and not the shooter, and who had a relatively minor criminal record, is not within the limits of civilized standards"].)  However, given the rigid requirements of the applicable sentencing laws and the extremely narrow grounds available-under both the state and federal constitutions-for finding that a sentence constitutes cruel and unusual punishment, we reluctantly conclude that the facts of this case do not permit such a finding.

      a. Disproportionality Claim

Appellant first argues that the sentence in this case is disproportionate, considering the circumstances of the offense and his particular characteristics, and therefore constitutes cruel and unusual punishment.

. . .

In the present case, appellant points out that he was only 15 years old when he shot Terrance Kelly.  He presented evidence at trial both that adolescents' brains are immature and that appellant was immature even for a 15-year-old.  He also presented evidence that he was of low average intelligence and that he suffered from PTSD.  In addition, there was evidence that appellant came from a loving family; that he had suffered only one prior juvenile adjudication for gun possession, a misdemeanor, for which he was on probation at the time of the shooting in the present case; and that he was doing well in school at Juvenile Hall.

There was some evidence suggesting that appellant killed Kelly after mistaking him for Marlin Daniels, whom appellant believed was going to retaliate against him for shooting Daniels's daughter with a BB gun.  However, there was also evidence suggesting that appellant killed Kelly because he did not like him and did not want Kelly invading his territory.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Appellant argues that this evidence, particularly regarding his impairments and his likely intent when he shot Kelly, while not necessarily negating his guilt of murder, "mitigate the seriousness of his offense." He asserts that, like the defendant in Dillon, he was surrounded and influenced by older people, including his brother Larry, Kevin Vaughn, and Markel Robinson, and that his actions were influenced by stress, anxiety, panic, and fear, even as he "became trapped in [a] deadly situation that was, inexcusably, of his own making."

Appellant, however, omits several important additional facts noted by the trial court in its lengthy and detailed discussion of this issue before and during the sentencing hearing. With respect to appellant, the court noted that it had heard during in limine motions "about aggressive, violent behavior that . . . clearly was not justifiable." The court also cited rap lyrics that appellant had written, most of which again were not admitted into evidence at trial, but which were extremely violent. The court stated: "I think it's terribly sad that someone at the age of 15 is feeling that kind of rage, and fixing that is not going to happen."

In addition, unlike in Dillon-where the defendant suddenly panicked and shot the victim-the evidence shows that a great deal of planning went into this crime, well beyond what the perceived danger warranted. . . .

We believe that appellant's youth, immaturity, PTSD diagnosis, and minor criminal record are all factors to consider here. However, when balanced against the other very troubling circumstances of the crime and evidence of appellant's anger and danger to society, as discussed by the trial court, we cannot conclude that this is one of those cases, occurring "'with exquisite rarity'" (Em, 171 Cal. App. 4th 964, 972), that like Dillon, warrants a finding of disproportionality.

. . .

The Court of Appeal also found that the sentence did not violate the narrow proportionality principle under the Eighth Amendment of the United States Constitution.

The court then addressed the claim based on categorical disproportionality as follows.

Appellant also argues that, regardless of the particular facts of this case, his sentence constitutes cruel and unusual punishment because the United States Supreme Court has consistently recognized that juveniles deserve special treatment under the law and are less culpable than similarly-situated adult offenders, evolving standards of

66

United States District Court
For the Northern District of California

decency require juveniles to be sentenced less harshly than adult offenders, and customary international law requires that juvenile offenders be given special protection.

Appellant relies on <u>Roper</u>, 543 U.S. 551, 561, 564, in which the United States Supreme Court held that the death penalty is excessive punishment for people under 18 years old, relying on "'the evolving standards of decency that mark the progress of a maturing society'" and a "national consensus against the death penalty for juveniles." The court further explained that various differences between juveniles and adults "render suspect any conclusion that a juvenile falls among the worst offenders." (<u>Id.</u> at 569-570; accord, <u>Thompson v. Oklahoma</u> (1988) 487 U.S. 815, 822-823 (reaching same conclusion with respect to minors under age 16.)

Appellant argues that the reasoning and result in <u>Roper</u> is equally applicable to the present case, in which a 15-year-old was sentenced to 50 years to life in prison. The Supreme Court, however, has repeatedly stated that "[p]roportionality review is one of several respects in which we have held that 'death is different,' and have imposed protections that the Constitution nowhere else provides. [Citations.]" (<u>Harmelin v. Michigan</u>, 501 U.S. at 994; <u>see also</u> <u>Ring v. Arizona</u> (2002) 536 U.S. 584, 605-606.) In <u>Roper</u>, 543 U.S. 551, 568-569 also, the court observed that "the death penalty is reserved for a narrow category of crimes and offenders." Thus, the death penalty is subject to "'unique substantive and procedural restrictions'" that do not apply to lengthy prison terms. (<u>People v. Demirdjian</u> (2006) 144 Cal. App. 4th 10, 14, quoting <u>Thompson v. Oklahoma</u>, 487 U.S. at 856 (conc. opn. of O'Connor, J.) . . . FN37

> FN37 Indeed, the <u>Roper</u> court affirmed the juvenile defendant's sentence of "'life imprisonment without eligibility for probation, parole, or release except by act of the Governor.'" (<u>Roper</u>, 543 U.S. at 560, . . .)

Appellant argues that there is an international consensus against sentencing minors to life in prison. <u>Roper</u>, 543 U.S. 551 described international opinion as "instructive" as "not controlling." (<u>Id.</u> at 575, 578.) The court in <u>Roper</u> rested its conclusion that the Eighth Amendment does not permit the death penalty to be imposed on juvenile offenders largely on the trend in this country toward abolition of the juvenile death penalty, noting that such a trend "carries special force in light of the general popularity of anticrime legislation [citation], and in light of the particular trend in recent years toward cracking down on juvenile crime." (<u>Id.</u> at 566.)

In contrast to the death penalty, there is no consensus in the United States against life sentences for juvenile offenders. Appellant has provided no relevant information regarding the law on life imprisonment of minors in this country. Respondent, however, has cited an article showing that, as of

United States District Court
For the Northern District of California

September 2006, 42 of the 50 states permitted the sentences of life in prison without the possibility of parole for juvenile offenders.  (Note, <u>Disposing of Children: The Eighth Amendment and Juvenile Life Without Parole After Roper</u> (2006) 47 B.C. L. Rev. 1083, 1089-1090.)

. . .

Appellant cites various international treaties and conventions that reflect international understanding that juveniles must be afforded special treatment in the criminal justice system. . . .  Although appellant may be correct that the trend in international law is toward the protection and rehabilitation of juvenile offenders rather than punishment and deterrence, at this time in history, there is plainly no consensus in this country, either legislative or judicial, against imposition of a sentence of 50 years to life in prison on juvenile offenders who have been convicted of first degree murder.  (<u>See</u> <u>Roper</u>, 543 U.S. at 566, 575, 578.)

Appellant's claim that his sentence constitutes cruel and unusual punishment cannot succeed.

<u>Pratcher</u>, 2009 WL 2332183, at *41-50 (footnotes omitted).

B. Analysis

1. Disproportionality

A criminal sentence that is significantly disproportionate to the crime for which the defendant was convicted violates the Eighth Amendment's prohibition of cruel and unusual punishment.  <u>Solem v. Helm</u>, 463 U.S. 277, 303 (1983) (sentence of life imprisonment without possibility of parole for seventh nonviolent felony violates Eighth Amendment).  "[O]utside the context of capital punishment, <u>successful</u> challenges to the proportionality of particular sentences will be exceedingly rare." <u>Id.</u> at 289-90 (emphasis in original) (citation and quotation marks omitted).  "'The Eighth Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime.'" <u>Ewing v. California</u>, 538 U.S. 11, 23 (2003) (quoting <u>Harmelin v.</u>

68

United States District Court
For the Northern District of California

Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring)).

Under this proportionality principle, the threshold determination for the court is whether the defendant's sentence is one of the rare cases in which a comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality. Harmelin, 501 U.S. at 1005; Ewing, 538 U.S. at 30-31. Only if such an inference arises does the court proceed to compare the defendant's sentence with sentences in the same and other jurisdictions. Harmelin, 501 U.S. at 1005. The threshold for an "inference of gross disproportionality" is quite high. See, e.g., Ewing, 538 U.S. at 30 (sentence of twenty-five years to life for conviction of grand theft with prior convictions was not grossly disproportionate); Harmelin, 501 U.S. at 1008-09 (mandatory sentence of life without possibility of parole for first offense of possession of 672 grams of cocaine did not raise inference of gross disproportionality); Lockyer v. Andrade, 538 U.S. 63 (2003) (upholding two consecutive twenty-five-to-life terms for two convictions of theft of videotapes with prior convictions).

The standard of review in § 2254(d) presents an additional problem for habeas petitioners asserting Eighth Amendment sentencing claims. In Andrade, 538 U.S. at 72-73, the Court rejected the notion that its case law was clear or consistent enough to be clearly established federal law within the meaning of 28 U.S.C. § 2254(d), except that it was clearly established that a gross disproportionality principle did apply to sentences for terms of years as well as to the death penalty. However, the precise contours of that principle "are unclear, applicable only in the

'exceedingly rare' and 'extreme' case." Id. at 73 (quoting Harmelin, 501 U.S. at 1001).

Petitioner argues that a sentence of fifty years to life is disproportionate to the crime committed. Although Petitioner cites the correct Supreme Court authority for this principle, the only case he cites where a court held a sentence for first degree murder to be disproportionate is People v Dillon, 34 Cal. 3d 441, 477-78 (1983). Petition at 82. In Dillon, the court reduced a judgment from first degree murder to second degree murder where a seventeen-year-old, along with several friends, attempted to steal marijuana plants from a small, secluded farm, planning, if necessary, to tie the owner of the plants to a tree or hit him over the head. In the course of the theft, Dillon shot the owner nine times. He was convicted of first degree felony murder. The court concluded that, although robbery-murder presents a high level of danger, the facts of the specific case mitigated Dillon's culpability because he had not intended to harm anyone and he only shot after the victim advanced towards him. The court also gave weight to the fact that Dillon had no prior criminal record, that his immaturity made it difficult for him to appreciate the danger and risk associated with the robbery, and that he was not a particularly dangerous person compared with other individuals convicted of murder. Id. at 488.

Petitioner argues that, at the time of the crime, he was two years younger than Dillon; he came from a good home and did well in school until he entered junior high and high school; according to the psychological reports, he was less psychologically mature than the average person his age; and exposure to violent crime, both as a witness and victim, caused him to develop PTSD.

70

In its opinion, the Court of Appeal analyzed and reasonably rejected Petitioner's argument that <u>Dillon</u> applied to him.  The court distinguished <u>Dillon</u> on the ground that, unlike Dillon, Petitioner planned the crime, there was no provocation from the victim, and Petitioner shot four times with a manual rifle into a parked car on a crowded city street.

Most damaging to Petitioner's habeas claim is that United States Supreme Court authority does not support it.  The Supreme Court has upheld a life sentence for a first-time offender whose crime was possession of a large quantity of cocaine, <u>see</u> <u>Harmelin</u>, 501 U.S. at 994-95, a sentence of twenty-five years to life for the theft of golf clubs under California's three strikes recidivist sentencing scheme, <u>see</u> <u>Ewing</u>, 538 U.S. at 28-29, and two consecutive terms of twenty-five years to life for the third strike conviction of petty theft, <u>see</u> <u>Andrade</u>, 538 U.S. at 77.  Given that the Supreme Court has upheld long sentences for crimes much less egregious than Petitioner's, Petitioner cannot claim that Supreme Court authority supports the argument that his sentence is unconstitutional.

Although these cases did not involve juveniles, the only two non-death penalty Supreme Court cases that addressed juvenile defendants do not aid Petitioner.  In <u>Graham v. Florida</u>, 130 S. Ct. 2011, 2034 (2010), the Court held that the Constitution prohibits the imposition on juveniles of a sentence of life without the possibility of parole for non-homicide crimes.  In <u>Miller v. Alabama</u>, 132 S. Ct. 2455, 2460 (2012), the Court held that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment.  Neither of these cases apply to Petitioner.

<u>Graham</u> is inapplicable because Petitioner was convicted of a homicide crime and because he was not sentenced to life without the possibility of parole.  <u>Miller</u> does not apply because Petitioner was not sentenced to life without parole.

Therefore, no Supreme Court authority supports the theory that, under the circumstances of his case, Petitioner's sentence was cruel and unusual.

> ### 2. Categorical Disproportionality

The crux of this aspect of Petitioner's argument rests on the fact that he was fifteen years old at the time he committed the crime.  In essence, Petitioner argues that his sentence was grossly disproportionate, not because his crime was not serious, but because of his limited culpability as a fifteen year-old.

In addition to a disproportionality challenge to a specific sentence, discussed above, a sentence may be challenged as disproportionate for categorical reasons.  <u>Graham</u>, 130 S. Ct. at 2022.  A finding of categorical disproportionality may be based upon the nature of the offense, the nature of the offender, or both.  <u>Id.</u> at 2022, 2027.  The Supreme Court had only found death sentences categorically disproportionate until it issued <u>Graham</u>, when it found that juveniles cannot be sentenced to a term of life without the possibility of parole for non-homicide crimes.  <u>United States v. Williams</u>, 636 F.3d 1229, 1233 (9th Cir. 2011) (citing cases).

A challenge to a category of sentences as disproportionate under the Eighth Amendment is informed by objective factors to the maximum possible extent.  <u>Atkins v. Virginia</u>, 536 U.S. 304, 312 (2002).  The clearest and most reliable objective evidence of

United States District Court
For the Northern District of California

contemporary values is the legislation enacted by the country's legislatures. Id. at 311-12; see Harris, 93 F.3d at 583 (at the very least petitioner must prove strong legislative consensus against imposing the challenged sentence).

In 2005, the United States Supreme Court recognized that a majority of states rejected the death penalty for offenders under eighteen and that evolving standards of decency required the prohibition of the death penalty for minors. Roper, 543 U.S. at 568. Roper overruled Stanford v. Kentucky, 492 U.S. 361 (1989), which had allowed capital punishment for minors. The trend towards forbidding capital punishment in other contexts (see Atkins, 536 U.S. at 312-13 (execution of mentally retarded offenders constitutes cruel and unusual punishment)), and the increased understanding of juveniles' culpability and immaturity, led to the Court's decision that common standards of decency no longer permitted the execution of juveniles. Id. at 569-74.

Petitioner argues that, under Roper, the Court of Appeal unreasonably denied his claim that, as a juvenile, his sentence was cruel and unusual. He points to the fact that Roper rested on the finding that juveniles are "immature and irresponsible," "susceptible to . . . peer pressure," lack "well-formed" identities and, thus, have lesser or diminished culpability such that they cannot form the mens rea necessary to be convicted of a capital crime. Petition at 92 (citing Roper, 543 U.S. at 568-74).

However, Petitioner does not account for the fact that Roper was a death penalty case. The Supreme Court began its analysis by announcing, "Because the death penalty is the most severe punishment, the Eighth Amendment applies to it with special force."

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

*Roper*, 543 U.S. at 568.  Although the *Roper* court acknowledged many factors that cause juveniles to be less culpable than adults, its analysis was informed by the fact that the defendant had been sentenced to death, the most severe punishment.  Furthermore, the *Roper* court's affirmance of the defendant's sentence of life without possibility of parole shows that the Court differentiated between the death penalty and other non-death sentences.  *Id.* at 560.  Because Petitioner was not sentenced to death, *Roper* does not provide Supreme Court authority supporting his claim of cruel and unusual punishment based upon his age.

In *Graham*, 130 S. Ct. at 2022-23, the Supreme Court, for the first time, considered a categorical challenge to a term-of-years sentence and determined that sentencing juvenile offenders to life without the possibility of parole for a non-homicide crime is unconstitutional.  The Court noted that a sentence of life without the possibility of parole is the "second most severe sentence permitted by law, particularly for juveniles who can expect to live, and serve, longer than adults."  *Id.* at 2027-28.  It relied upon statistics showing that the practice of imposing such a sentence is "exceedingly rare," which indicates a national consensus against it.  *Id.* at 2026-27.  It cited *Roper* for the proposition that, because juveniles have less culpability, they are less deserving of the most severe punishment and noted that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers."  *Id.* at 2026-27.  Finally, it observed that the Eighth Amendment does not prohibit incarceration of a person convicted of non-homicide crimes

**United States District Court**
For the Northern District of California

1 committed as a juvenile for life so long as they are given the
2 opportunity for parole.  Id. at 2030.

3      Like Roper, Graham does not support Petitioner's claim.  It
4 involved a sentence of life without parole, whereas Petitioner is
5 eligible for parole.  It involved a sentence for a non-homicide
6 crime, whereas Petitioner was convicted of first degree murder.

7      The Supreme Court has recently issued a third opinion
8 addressing the sentencing of juveniles.  In Miller v. Alabama, 132
9 S. Ct 2455, 2460 (2012), the Court held that mandatory life without
10 parole sentences for juveniles violate the Eighth Amendment.  The
11 Court, however, did not foreclose a sentencing court's ability to
12 impose this sentence in homicide cases after it considered "how
13 children are different, and how those differences counsel against
14 irrevocably sentencing them to a lifetime in prison."  Id. at 2469.

15     Miller also does not apply to Petitioner because he was not
16 sentenced under a mandatory life without parole sentencing scheme.
17 See Bell v. Uribe, __ F.3d __, 2013 WL 4750069, *10 (9th Cir. 2013)
18 (Miller not applicable because sentencing court could take
19 mitigating factors into consideration and, thus, the sentence of
20 life without parole was not mandatory).  Furthermore, in
21 Petitioner's case, the Court of Appeal and the trial court took
22 Petitioner's age and mental status into consideration when
23 reviewing the constitutionality of his sentence.  See Pratcher,
24 2009 WL 2332183, at *42-44, 45-47.

25     In light of the above, the Court of Appeal's rejection of this
26 claim was not contrary to or an unreasonable application of
27 established Supreme Court authority.

28

United States District Court
For the Northern District of California

VIII. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability in the ruling.  Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate must indicate which issues satisfy this standard.  28 U.S.C. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

The Court finds that reasonable jurists could find its assessment of the following claims debatable or wrong: (1) the Sixth Amendment claim based on juror misconduct and (2) the Eighth Amendment claim based on cruel and unusual punishment.  Petitioner has not made a substantial showing of the denial of a constitutional right on the other claims in his petition.  Therefore, a certificate of appealability is granted, in part.

Petitioner may not appeal the denial of a certificate of appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate

1  Procedure. <u>See</u> Rule 11(a) of the Rules Governing Section 2254

2  Cases.

3                              CONCLUSION

4      For the foregoing reasons, the petition for a writ of habeas

5  corpus is denied.

6      The Clerk shall substitute Warden Randy Grounds as Respondent,

7  enter judgment and close the file.

8      IT IS SO ORDERED.

9
   Dated:      9/30/2013
10                                     _____
                                       CLAUDIA WILKEN
11                                     United States District Judge